**ROYAL MAIL LINES, LTD., Appellant,**

v.

**Joseph PECK and Associated-Banning Company, a Corporation, Appellees.**

**No. 15806.**

United States Court of Appeals Ninth Circuit.

June 29, 1959.

Lillick, Geary, McHose, Roethke & Myers, L. Robert Wood, John F. Kimberling, Los Angeles, Cal., for appellant.

Mitchell Levy, Long Beach, Cal., Robert Sikes, Los Angeles, Cal., Sam Rosenwein, Burbank, Cal., for appellees.

Before FEE, CHAMBERS and BARNES, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

Peck commenced action against Royal Mail Lines, Ltd., for personal injuries received aboard the M.S. Parima, claimed to result from the negligence of Royal Mail and the unseaworthiness of the M.S. Parima, and demanded jury trial. Royal Mail impleaded and sought indemnity from Associated-Banning Company, the stevedore by whom Peck was employed. It was stipulated that, as between Peck and Royal Mail, all appropriate issues should be submitted to a jury. It was further agreed that questions of fact and law relating to unseaworthiness should be determined by the court and all issues between Royal Mail and Associated should also be decided by the court.

The jury found a verdict for Peck against Royal Mail. Thereupon, the trial court entered findings of fact to the effect that the Parima was unseaworthy in that a topping lift was not properly secured, that Associated did not create the unseaworthy condition, and that negligence on the part of Royal Mail in failing to provide a reasonably safe place to work was the proximate cause of the injuries to Peck. It was concluded Associated did not violate any contractual or consensual obligation it owed to Royal Mail and was not required to indemnify the latter.

There are three questions on appeal. First, the award to Peck is attacked upon the ground of the supposed failure of the evidence to show negligence of Royal Mail. Second, it is claimed by Royal Mail that the evidence does not show that the ship was unseaworthy. Third, it is contended by Royal Mail that Associated breached its contractual obligation to perform the work as stevedore in a safe and workmanlike manner and that indemnity for the award to Peck was due Royal Mail.

The evidence was quite voluminous. The Parima arrived in Los Angeles on April 3, 1955, in the forenoon. The cargo booms were raised by the crew of the ship before 1:00 p.m., at which time the employees of Associated boarded the vessel and proceeded to adjust the booms preparatory to loading cargo. The particular boom with which we are con-

cerned was supported by a wire cable called the "topping wire," which ran from the tip of the boom through a series of blocks to the mast and thence to bitts mounted on the deck. The crew topped the boom and made it fast by lashings around the bitts, where it remained set until Wicks, an employee of the stevedore, attempted to lower it in an improper manner hereinafter described.

Peck, also an employee of the stevedore, was hatch tender and gang leader at No. 2 hatch. At the time of the accident, he was on a deck load of lumber. Wicks, acting as hatch boss of No. 3 hatch in the immediate vicinity, attempted to lower the boom alone without waiting for available assistance or appliances. It was uncontroverted that the boom did fall as soon as Wicks unfastened some of the turns of the wire around the bitts. Peck was injured by the fall of the boom.

The theory upon which the cause was tried before the jury was that Royal Mail was guilty of negligence in that a reasonably safe and proper place to work had not been furnished to Peck.

The complaint is based upon this theory of unsafe place to work, with specifications of insufficient and unsafe area for the handling of the boom, improper storage of cargo, unsafe and unfit condition of the boom and failure to inspect and failure to warn. There was no specific allegation in the complaint as to the number and kind of turns of the wire around the bitts. All are agreed that three or four figure-eight turns should be placed over three round turns in order to secure the boom in the traditional manner. There was a conflict in the evidence as to whether, when Wicks loosened the fastenings of the wire around the bitts, there were three round turns or only two thereon. There was no question that there were sufficient figure-eight turns to hold the boom securely. Only as a result of the unloosening of the latter by Wicks, the boom fell.

It is urged that the sole cause of the injury to Peck was the negligence of Wicks and that therefore there could have been no recovery against the ship or its owners. But the jury unquestionably found to the contrary.

■ The jury verdict then was based upon the finding that Royal Mail did not furnish Peck a safe place to work. In the ordinary course of events, a topping boom does not fall upon a workman. From the occurrence itself, an inference of negligence my possibly have been drawn.[1] The jury may have believed that the cargo stowage, the number of turns on the bitts, the lubrication of the topping wire or the action of Wicks may have explained, caused or contributed to the fall of the boom. We have no means of knowing. The jury was not told explicitly that, if the action of Wicks were the proximate cause of the injury, no recovery against Royal Mail could be had. Royal Mail took no exceptions to the instructions of the court to the jury. This finding of the jury therefore was not based upon any spe-

1. This is speculation. There is no attempt to insinuate the idea that the doctrine of res ipsa loquitur was applicable. A similar doubt as to the basis of the jury verdict is found in Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 568, 78 S.Ct. 438, 441, 2 L.Ed.2d 491: " * * * the verdict for Connolly [the injured longshoreman] did not ipso facto preclude recovery of indemnity by petitioner [shipowner], for as we have indicated, the duties owing from petitioner to Connolly were not identical with those from petitioner to respondent [stevedore company]. While the jury found petitioner 'guilty of some act of negligence,' that ultimate finding might have been predicated, inter alia, on a failure of petitioner to remove the shelter when the ship left New York, or a failure to correct or warn respondent of a latent dangerous condition known to petitioner when respondent began the Boston unloading. Likewise the finding might have been predicated on a failure of petitioner during the five days in Boston to inspect the shelter, detect and correct the unsafe condition. Although any of these possibilities could provide Connolly a basis of recovery, at least the latter would not, under Ryan, prevent recovery by petitioner in the third-party action."

cific defect in the M.S. Parima, its boom, "gear, cable, winches, tackle, bitts and appurtenances." The verdict was a general finding for plaintiff Peck and against defendant Royal Mail, with the amount of damages assessed. A judgment was entered on August 9, 1957, for $7,000.00. Upon the ground that the owners were primarily liable for negligence in failing to furnish a safe place for Peck to work aboard the ship, this judgment in favor of Peck and against Royal Mail is affirmed.

Thereafter, on August 30, 1957, the court, as noted above, entered findings of fact, conclusions of law and order for a second judgment. Contained therein is a recital of the jury verdict and judgment just above referred to. There is direction for a judgment in favor of Peck in the amount of $7,000.00 for unseaworthiness "coexistent with, and not additional to, the sum of $7,000.00 awarded" by the jury and a denial of recovery by Royal Mail against Associated upon a third party complaint for indemnity.

The purpose of the second judgment seems to have been to lay a basis for denying indemnity. Peck already had a judgment based upon negligence. The question as to whether the first judgment is or could be res judicata has not been urged, so we make no holding thereon.

Since the jury generally found the owners negligent for failing to furnish a safe place for Peck to work, there is no method of segregating one piece of equipment or one action of the crew and characterizing it as unseaworthiness or negligence in virtue of the verdict alone.

As between Peck and Royal Mail, there is a finding of negligence. However, the responsibility between the stevedore and the ship depends upon other principles.

Associated urged strongly that the trial judge need not rule upon the negligence of Associated, upon the assumption that the jury had in fact passed upon the issue as between the stevedore and Royal Mail. As previously noted, this issue was not clearly placed before the jury, since that body was instructed that, if Royal Mail were found to be negligent, it mattered not how negligent another person might have been. The instruction did not even clearly present the possibility that the negligence of Wicks might have been the proximate cause of the injury. It was imperative under the stipulations that independent findings be made upon proper issues between Associated and Royal Mail. None was tendered in face of the contention by Royal Mail that the evidence would not support such findings.

The particular issue of responsibility between the ship and the stevedore was never stated, much less tried. It was not submitted to the jury. The attention of the jury was directed to the issue of negligence between the longshoreman, Peck, and Royal Mail alone.

The second question is whether it was properly concluded that the ship was unseaworthy. To liability under this latter doctrine we now turn.

As between Royal Mail and Peck, it was found that the Parima was unseaworthy. It was assumed that such findings were compelled by the verdict of the jury. This position disregards the fact that the one charge of negligence submitted to the jury, as above noted, was a failure to furnish a reasonably safe place to work. This verdict then does not in and of itself furnish a foundation for a finding of unseaworthiness.[2]

Negligence and unseaworthiness are not equivalent. A finding of negligence is neither a substitute foundation for, nor a finding of unseaworthiness. In a recent opinion of the United States Supreme Court, which has no relation on its facts to the problem here,

---

2. "The obligation of the vessel owner to provide seaworthy appliances has not been extended to require the owner to keep these appliances from being used in a negligent manner. If so used, liability rests upon negligence rather than unseaworthiness." Imperial Oil, Limited v. Drlik, 6 Cir., 234 F.2d 4, 8.

occurs a statement as to the basis of present liability for unseaworthiness, which serves as background for further discussion. It is said:

"The eventful development of the doctrine of unseaworthiness in this court is familiar history. Although of dubious ancestry, the doctrine was born with The Osceola [189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760] and emerged full-blown 40 years later in Mahnich v. Southern S.S. Co. [321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561] as an absolute and nondelegable duty which the owner of a vessel owes to the members of the crew who man her. The justification for this rigid standard was clearly stated in the Court's opinion in Mahnich:

" 'He [the seaman] is subject to the rigorous discipline of the sea, and all the conditions of his service constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers.' 321 U.S. 96, at page 103, 64 S.Ct. 455, at page 459." United New York & New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 519, 3 L.Ed.2d 541.

The point of this discussion is that there were no findings of the court upon which unseaworthiness could be predicated. The key findings are:

"4. That the plaintiff Joseph Peck sustained injuries when struck by a falling boom at No. 3 hatch at said time and place as a proximate result of the negligence of the defendant Royal Mail Lines, Ltd., in failing to furnish the said plaintiff with a reasonably safe place in which to work in that the said defendant, through its agents and employees acting within the course and scope of their employment, had negligently and improperly lashed the cable supporting the said boom at No. 3 hatch; the Court further finds that the boom would not have fallen if it had been properly lashed by the said defendant's employees prior to the longshoremen coming on board the vessel; and the Court further finds that the said negligence on the part of the defendant's employees was continuous up to and including the time when plaintiff was injured.

"5. That the plaintiff Joseph Peck sustained injuries when struck by a falling boom at No. 3 hatch at said time and place as a proximate result of the unseaworthiness of the said vessel, said unseaworthiness consisting of the boom at No. 3 hatch and its supporting cable not being secured properly for the purpose of supporting and holding said boom."

The first is in terms not a finding of unseaworthiness, but a finding of negligence. The second, although stated in terms of unseaworthiness, was actually a finding of negligence. If it be taken as a finding of unseaworthiness, it is clear error and contrary to all the evidence. The whole record demonstrates that "the boom at No. 3 hatch and its supporting cable" were "secured properly for the purpose of supporting and holding said boom." The negative finding on this feature is in fact without support. The entire evidence demonstrates that the fastenings were sufficient to hold, and did hold, the boom up until Wicks attempted to surge the topping lift through the bitts by hand without the aid of the chain stopper.

It has thus been demonstrated that there was clear error in finding that the fastening did not support the boom. No finding was made as to the number of turns on the bitts, as to which there was a conflict in the evidence. There was no finding of fact upon which unseaworthiness could be predicated. Therefore, the cause should be remanded for findings upon this issue.

There was a failure to recognize the deep gulf between allegations of negligence and charges of unseaworthiness. The distinction is highly technical and historical in genesis. But it does exist.

It sounds in jurisdiction. It must be taken into account in decision.

The distinction has been recognized in the recent case of Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 485, 3 L.Ed.2d 368;

> "Here we merely decide that a district judge has jurisdiction to determine whether a cause of action has been stated if that jurisdiction has been invoked by a complaint at law rather than by a libel in admiralty, as long as the complaint also properly alleges a claim under the Jones Act [46 U.S.C.A. § 688]."

The distinction was illustrated in the case at bar by the action of the parties and the court. There was no attempt to exercise "pendent jurisdiction." [3] Instead, the action at law was tried by the jury. The charge in admiralty was, by consent of the parties and the judge, tried to the court.

■■ The chief contentions of Royal Mail relate to the third question regarding the indemnity. Undoubtedly, these criticisms of the holding are valid, at least in part. The statement in a finding that Associated did not violate any contractual or consensual obligation owing Royal Mail in the premises is of law and not of fact. It is the statement of a conclusion. While there was no express clause in the contract with Royal Mail which imposed liability upon the stevedore for personal injuries resulting from improper action in unloading, such as appears in many contracts of this nature, there was a consensual obligation to perform the work in a proper manner. It has been held recently that the stevedore impliedly assumes a contractual obligation to perform its duties with reasonable safety, not only to the handling of cargo, "but also to the use of equipment incidental thereto." Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491. The case just cited was decided by the Supreme Court of the United States subsequent to the entry of judgment in the case at bar.

There can be no distinction drawn between such cases where the contract provided only for doing the job in a workmanlike manner and the contract in this case, which provided that, in case of mishandling, the stevedore should be liable for damages to property. The principle announced was universal. The law has already imported into the contract the obligation above outlined.[4]

■■ It is clear, by entry into the contract to unload the Parima, Associated assumed an obligation to perform the work as stevedore in a safe and workmanlike manner. It must be then con-

---

**3.** Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, defined that a federal court may take ancillary jurisdiction of a state created cause of action if the same facts also gave rise to a right of action based upon a substantial federal question. This principle has been applied in maritime cases to permit an entire proceeding to be heard within either the law or the admiralty jurisdiction of the federal court. See Jenkins v. Roderick, D.C., 156 F.Supp. 299. However, even the exercise of a pendent jurisdiction cannot alter the right to recovery under these different forms of action. Although the causes of action be based upon the same facts, still, different elements must be established to recover under each. Cf. The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 523, 3 L. Ed.2d 524; United Pilots Sandy Hook Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541.

**4.** In Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, the shipowner was allowed to recover indemnity from the stevedore company for the damages paid to a longshoreman injured as a result of improperly stowed cargo, where there was no express indemnity clause. "That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. * * * It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product." 350 U.S. at pages 133–134, 76 S.Ct. at page 237.

sidered whether, by his actions, Wicks breached this obligation. Since there was no finding upon this question, the judgment lacked foundation.

The question whether Associated breached its obligation depends entirely upon the view taken of the role of Wicks as an actor. Royal Mail says that a breach of the obligation of the contract for reasonably efficient performance resulted from the acts of Wicks and that the liability therefrom of Royal Mail was foreseeable. Now, as this contention had some substantial basis, Royal Mail would probably be entitled to indemnity "absent conduct upon its part sufficient to preclude recovery." [5] To these questions the trial court should address itself. A review of the considerations is here made.

There was a flat contradiction between two witnesses, one a seaman employed by the ship and the other a longshoreman in the employ of the stevedore. The "bosun" testified [6] the boom was topped that morning by him with the help of one other man, and that this was done by the use of the chain stopper. He also swore there were three round turns and four figure-eights securing the top lift wire to the bitts. The latter, Enyeart, testified by deposition that he was watching Wicks remove the figure-eight turns. As Wicks was taking off the last figure-eight turn, Enyeart "happened to notice" that there were only two round turns on the bitts and he yelled so that his partner would step out from under the boom. This his partner did and was not injured. If Enyeart could see the condition, Wicks was in duty bound to see it also before the figure-eights were removed.

Wicks, the foreman of this hatch, without inspecting the fastenings on the bitts or the lubrication on the topping lift, attempted to surge the line through the bitts alone and thus lower the boom, but was unable to keep the wire from running away after he had removed the figure-eights. There was positive evidence that the surging the lift through the bitts by hand is dangerous and was never practiced by the crew themselves on the ship for that reason. There was no attempt to lower the boom by taking the topping lift wire to the gypsy head.

5. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 567, 78 S.Ct. 438, 441. The leading Supreme Court cases on the subject, Ryan Stevedoring Co., supra, and Weyerhaeuser Steamship Co., supra, dealt with situations where the initial fault was that of the stevedore. The resulting condition may, in each of these instances, have rendered the ship unseaworthy or the owners negligent because of a failure to inspect. However, in American President Lines, Ltd. v. Marine Terminals Corporation, 9 Cir., 234 F.2d 753, the initial fault was that of the ship, but it was determined that this fault was passive and secondary, that the breach of obligation by the stevedore was "the sole active or primary conduct causing the injury." page 759.
Ameroccan Steamship Company v. Copp, 9 Cir., 245 F.2d 291, and United States v. Harrison, 9 Cir., 245 F.2d 911, presented instances where the ship was held liable and the evidence indicated that the conduct of the ship and its officers was such that it was not entitled to indemnity, even though the stevedore might have been negligent in continuing work in the face of dangerous conditions created by the ship and of which the ship and its officers had continuous knowledge but made no attempt to correct. In both these cases, the unseaworthiness of the ship was found by the trial court to be the proximate cause of the injury.

6. "A. I took the wire, the top lift wire to the drum end, put four or five turns on, put a man on the winch and hauled them up and when I got it at an angle— the starboard derrick got it at an angle of 45 degrees I stopped the winch and put the stopper on, the chain stopper and eased back off the drum end until I got it away from the chain stopper and I put three round turns on the bitts, what I call the bitts, and four figure 8 turns and a piece of Manila and lashed the wire so it wouldn't slip off.
"Q. Who did what? Did you actually put the turns on, or Rowbottom? A. I put the chain stopper on.
"Q. And Rowbottom put the turns on the bitts? A. Yes.
"Q. You stood there watching him? A. Yes."

The stopper chains, which were necessary for use on this particular ship in such an operation, were available. If none was actually at the topping lift, one was available upon request.

But there was no attempt to use these means. There was evidence that the crew raised these booms by putting the chain stopper on and fastening the line to the gypsy head.

There is no evidence in the record that Wicks tested his control over the boom at all. The inference from the testimony of Enyeart may well be drawn that he was not testing, because Enyeart saw there were only two round turns before the last figure-eight was removed. If Wicks had stopped at that point or if he had been using the stopper chain or if three men had been engaged in the effort to surge the line through the bitts, the accident might well have been prevented.

In this posture, it is striking that the actor, Wicks, gave no testimony, either personally or by deposition. However, this Court will not attempt to solve that conflict.

■ On the third question, there is a contention that Royal Mail had breached this contract, which contains mutual obligations. It is doubted that this contention is properly founded. But, as has been pointed out, there was no finding of unseaworthiness as to the fastening of the topping lift upon the bitts. A finding of unseaworthiness which was supported by competent evidence would have been given great weight, for this duty is not delegable. However, even existing unseaworthiness, which would not have produced the injury except for the negligence of the stevedore, does not necessarily prevent recovery by Royal Mail. The action of Wicks in attempting to surge the topping lift through the bitts without use of proper safeguards seems the proximate cause of the accident. In Crumady v. The Joachim Hendrik Fisser, 79 S.Ct. 445, 448, where there was unseaworthiness, the District Court, 142 F.Supp. 389, had made a positive finding of facts from which it concluded the ship was unseaworthy. Since there would have been no accident or injury if the longshoremen had not taken independent negligent action, recovery by the ship against the stevedore was allowed. The court there said:

"We conclude that since the negligence of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over."

■ In the area of contractual indemnity, an application of the theories of "active" or "passive" as well as "primary" or "secondary" negligence is not appropriate.

In any event, even if it were proper to compare conduct of the stevedore with that of the ship, it is certain neither the District Judge nor the jury determined the issue of negligence between Associated and Royal Mail, although there is a formal finding to the effect that the negligence of Associated was not the sole active or primary cause of the injuries of Peck.

The controlling decisions had not yet been announced when judgment was entered in the case at bar. For that reason, the cause will be remanded for further proceedings. There must be findings on the key issues. There must be positive findings of fact as to unseaworthiness. Likewise, there must be positive findings as to the action of Wicks. In view of the contractual obligation of the stevedore to perform its duties by handling the boom and appurtenances in a safe and workmanlike manner, if the evidence reflects a substandard performance, the ship would be entitled to indemnity unless there were conduct upon its part which nullified the obligation.

For the resolution of these issues, the cause is returned to the trial court.

Remanded.