Ralph BILLECI, Libelant,

v.

UNITED STATES of America,
Respondent,
and
California Stevedore and Ballast Company, Respondent-Impleaded.

No. 27871.

United States District Court
N. D. California, S. D.

July 11, 1960.

Mansfield Davis, Herron & Winn, San Francisco, Cal., for libelant.

Lynn J. Gillard, U. S. Atty., Keith R. Ferguson, Sp. Asst. to the Atty. Gen., Ben N. Cole, Sp. Atty., Admiralty & Shipping, San Francisco, Cal., for respondent.

Partridge, O'Connell, Partridge & Fall, San Francisco, Cal., for respondent-impleaded.

ROCHE, Judge.

Libelant alleges that he has sustained injuries caused by the negligence of respondent and/or the unseaworthiness of the U.S.N.S. General Hugh J. Gaffey, a vessel owned by respondent. Denying libelant's allegations, respondent contends that in the event libelant succeeds, respondent is entitled to full indemnification from respondent-impleaded.

On Saturday, March 29, 1958, the General Gaffey was secured port side to pier at Oakland Army Terminal, Oakland, California. At 8:00 A.M., a gang of longshoremen employed by respondent-impleaded came aboard and went to work discharging cargo from No. 7 hatch. At approximately 8:30 A.M., the longshoremen—including libelant—moved to No. 5 hatch. In accordance with custom and practice, before the longshoremen arrived, the booms at No. 5 had been uncradled by the ship's crew, and set in the approximate positions necessary for handling cargo. Libelant's gang adjusted the port yardarm boom, trimmed gear, and then commenced removing the hatch covers from the various deck levels of hatch No. 5. Each section was lifted from the hold by the coordinated use of the port and starboard winches, controlled by a single driver. This activity continued in progress until the time of the accident. At 9:55 A.M., libelant was working on the second deck level, two decks below the weather deck. There is nothing in the record to indicate that he was exercising less than due care for his own safety. He had just completed the task of attaching a hatch section to the removal apparatus and was standing on the port side aft of the hatch, waiting for the section to clear the hold. It had been raised only a few feet when the starboard winch fell out of gear and became freewheeling, causing the hatch section being lifted to simultaneously drop and swing to the port side. It skidded when it hit the structure of the ship and struck libelant with considerable force, causing severe injuries to his left foot.

Libelant, as a longshoreman performing "the ship's service," was entitled to the same protection against unseaworthiness which members of the crew would have received, a duty imposed upon the shipowner which he cannot delegate. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 877, 90 L.Ed. 1099. The warranty of seaworthiness extends to appliances that are appurtenant to the ship; the owner must keep them in order as well as furnish them. Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. Boudoin v. Lykes Bros. S.S. Co., 1955, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Mitchell v. Trawler Racer, Inc., 1960, 80 S.Ct. 926. The duty is not less onerous because the shipowner has no actual or constructive knowledge of the unseaworthy condition or because the condition is only temporary. Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Mitchell v. Trawler Racer, Inc., supra.

There are two commonly used safety devices to keep a winch of the type carried by the General Gaffey from falling

out of gear. The gear shift or lever has welded to it a flat steel "strap" in which there are two holes. The winch may be locked in or out of gear by inserting a pin—chained to the winch for this purpose—through one of the holes and down into a contiguous hole in the main structure of the winch. Or the lever may be lashed in gear with wire or rope. It is evident from the record that the type of winch carried by the General Gaffey is not uncommon and that the longshoremen who operated it were familiar with its safety devices.

It is undisputed that at the time libelant was injured and during the preceding hour and a half that the starboard winch was operated by the longshoremen, neither of the two precautionary measures was used. All parties concede that this was the proximate cause of libelant's injuries, as winches do not ordinarily fall out of gear if the locking pin is in place or the lever is lashed in position. What is in dispute is the reason why neither safety device was used by the longshoremen. Libelant contends that the "strap" welded to the lever was bent out of alignment to the extent that the locking pin could not be inserted, and therefore, the winch was unseaworthy. Respondent counters that the condition of the winch was such that the pin could easily have been inserted, that the winch was in all respects seaworthy, and that libelant's injuries were directly and solely caused by a fellow longshoreman's negligent operation of the winch. Respondent argues further that even if the locking pin could not have been used, nothing prevented the longshoremen from lashing the lever, and therefore, it was still seaworthy.

■ The court will state at the outset that if the locking pin device on the starboard winch was incapable of being used at the time libelant was injured, then respondent shipowner is liable for unseaworthiness even though an alternate and completely satisfactory safety measure—lashing—was available. In Mahnich v. Southern S.S. Co., supra, the Supreme Court found unseaworthi-

ness as the result of the negligent selection of defective rope to rig a staging which later collapsed, although there was sound rope aboard which could have been used. Applying this reasoning to the instant case, it is immaterial to the issue of unseaworthiness that an alternate safety measure was available if, in fact, respondent supplied a faulty safety device and the alternate measure was not used. It is undisputed that the winch was not lashed, so the court's decision must rest on a determination of whether or not the locking pin device—a permanent fixture on the winch—was operative at the time libelant sustained his injury.

■ Libelant's contention in this crucial issue rests principally upon the testimony of one of the winch drivers, Anthony Brandon, and to a lesser extent upon the testimony of other members of libelant's longshore gang. Brandon was not operating the winch at the time of the accident, but he had taken his "turn" at the controls earlier the same morning. At trial he testified that the bent condition of the strap made it impossible for him to insert the pin, that he did not even try to do so, and that the pin itself was lying on the deck. But in statements made previously—testified to in court by the Government's investigator Donald Larsen—he had stated that the pin was hanging from its chain and that he did attempt to insert it but could not. Brandon's testimony was by far the most comprehensive and detailed which libelant offered, and accordingly, the most vital to libelant's case. But the weight which the court is able to give to this evidence is considerably lessened by the inconsistent and even contradictory statements which the witness had made on previous occasions.

Respondent offered unimpeached testimony from Morris Chamberlain, engineer on the General Gaffey, that he examined the winch immediately after the accident and had no difficulty inserting the pin. He further testified that he was told by the winch driver that the pin had jumped out. He himself then tested the winch but was unable to make the pin

jump out. No repairs to the winch were made then or subsequently. Prior to the accident the winch had been inspected at least once a week and no defects had been discovered. His testimony was corroborated by that of Erin Askenbach, acting master of the General Gaffey at the time of the accident, who stated that he examined the winch later the same morning and saw the pin properly engaged. It is conceded that the longshoremen continued to operate the winch after the accident and that no complaints regarding its condition were received by the ship's officers or by the longshore gang boss prior to the accident.

The court must choose between these conflicting accounts. In doing so it is guided by the rule of law which places the burden of proving his case by a preponderance of the evidence upon libelant. The court finds that libelant has not carried his burden, that on March 29, 1958, the starboard winch at hatch No. 5 on the General Gaffey was in good working order and properly equipped with a locking pin safety device.

Libelant argues that even if nothing was mechanically wrong with the winch, nevertheless the ship was unseaworthy because the crew had not actually inserted the locking pin before turning the vessel over to the stevedore. He relies heavily upon the holding in Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. There, the Supreme Court reinstated the finding of the District Court that an adjustment of a winch by those acting for the vessel owner, which adjustment made operation of the winch dangerous for the work at hand, rendered the vessel unseaworthy. The cut-off of the winch— its safety device—had been set at twice the limit which the rigging could bear. The case holds that a ship with sound equipment may be made unseaworthy by the faulty adjustment of that equipment *by those acting for the ship* (emphasis added). The record in the instant case indicates that it was not the function of the ship's crew to lock the winches in gear before relinquishing control to the stevedore. Libelant's own witnesses testified that part of the stevedore's job is the raising, lowering, and general positioning of the booms, work that entails the shifting of gears and consequently, the removal and replacement of the pin which locks the winch in and out of gear. Hence, even assuming that the General Gaffey's crew had left the starboard winch at hatch No. 5 with the pin simply hanging at the end of its chain, the court cannot thereby conclude that the vessel was rendered unseaworthy, because the locking pin—unlike a cut-off—does not remain in a fixed position during stevedoring operations. Libelant's witnesses testified that it was, in fact, unnecessary to shift gears on the starboard winch during operations on the morning of March 29. But they also testified that they had shifted gears on the port winch in order to adjust the booms and that such adjustments were a routine part of their work. The position of the safety pin—as well as its function—was apparent to any experienced winch operator. He had merely to place it in the proper hole. The longshore gang boss, testifying for libelant, stated that it is the job of the winch driver or his helpers to put the pin in. The situation is clearly distinguishable from that of the Crumady case, in which there was no justification at any time or under any circumstances for setting the cut-off at twice the maximum load that the winch could safely handle. Nor is there anything in Crumady to indicate that it was ever a part of the stevedore's job to set the cut-off.

Libelant argues further that as of the moment when the winch began to be operated without any safety device, the General Gaffey became unseaworthy and remained so as long as the winch was in operation, which was approximately from 8:30 A.M. until the accident. He contends that even if the sole fault was that of a fellow longshoreman negligently operating a seaworthy winch, the vessel owner is still liable because it has been held that a negligent longshoreman can render a ship unseaworthy. Grillea v. United States, 2 Cir., 1956, 232 F.2d

919. Although it would seem logical that if longshoremen receive the shipowner's warranty of seaworthiness because they are doing "ship's work," by the same token their action in creating an unseaworthy condition should be attributable to the shipowner just as the actions of his own crew members would be, this court is not of the opinion that the Supreme Court has actually made the necessary logical extension by its mere mention of the Grillea decision in Crumady v. The Joachim Hendrik Fisser, supra.[1] Nor has the Court of Appeals for this Circuit passed upon the question. Titus v. The Santorini, 9 Cir., 1958, 258 F.2d 352, 354. Until such time as it does, this court must be guided by the rulings of the Appeals Court that negligent operation of seaworthy appliances by longshoremen cannot create liability in the shipowner. Freitas v. Pacific-Atlantic Steamship Co., 9 Cir., 1955, 218 F.2d 562; Phipps v. N. V. Nederlandsche Amerikaansche Stoomvart, Maats, 9 Cir., 1958, 259 F.2d 143; Royal Mail Lines, Ltd. v. Peck, 9 Cir., 1959, 269 F.2d 857. Furthermore, Judge Hand emphasized in Grillea that the longshoreman's negligence had actually created an unseaworthy condition in the ship's hull, i. e. a 'tweendeck that was unsafe to work upon.[2] In the instant case, the negligence of the winch driver did not make the winch itself less than seaworthy nor did it render any other ship's gear or appurtenances unseaworthy. The vessel was unsafe only so long as the negligence continued, whereas in Grillea, the negligent act terminated shortly after it began, but the unsafe situation continued to exist.

Libelant's cause of action in negligence is based upon contentions that members of the General Gaffey's crew were negligent in their supervision of the activities carried on by libelant's longshore gang, that proper and timely inspection by the ship's officers would have revealed that the starboard winch at hatch No. 5 was being operated without necessary safety precautions, and that therefore, the ship's officers were under a duty to suspend operation of the winch until it was made safe for use. As authority, libelant cites the recent decision of the Court of Appeals in Aldridge v. States Marine Corporation of Delaware, 9 Cir., 1959, 265 F.2d 554. In that case, the court found that a complaint alleging that a ship's officers—although specifically requested to do so—failed to furnish proper tools to a longshoreman, was sufficient to state a cause of action in negligence. That holding is not applicable here, where the record discloses that the ship's officers received no complaints or requests from the longshoremen and the equipment supplied was entirely adequate.

Libelant has not convinced the court that the crew of the General Gaffey was negligent in its supervision of the stevedoring operation in question.

The libel is dismissed. Because the court finds that respondent is not liable for injuries suffered by libelant, it is unnecessary to determine whether respondent-impleaded would be liable to indemnify respondent.

Respondent will submit findings of fact and conclusions of law in accordance with the foregoing.

---

1. The Court explicitly states, "We need not go so far to sustain the District Court here." 358 U.S. 423, 427, 79 S.Ct. 445, 448, 3 L.Ed.2d 413.

2. "The cover was one of two or three that they had already put in place on the after section of the hatch; it had become part of the platform across which the two walked to gain access to the middle section on which they were going to place another cover. The misplaced cover had therefore become as much a part of the 'tweendeck for continued prosecution of the work, as though it had been permanently fixed in place." 232 F.2d 919, 922.