# UNITED NEW YORK AND NEW JERSEY SANDY HOOK PILOTS ASSOCIATION ET AL. *v.* HALECKI, ADMINISTRATRIX.

No. 56. Argued October 23, 1958.—Decided February 24, 1959.

*Lawrence J. Mahoney* argued the cause and filed a brief for petitioners.

*Nathan Baker* argued the cause for respondent. With him on the brief were *Bernard Chazen* and *Milton Garber.*

*Solicitor General Rankin, Assistant Attorney General Doub, Samuel D. Slade, Leavenworth Colby* and *Seymour Farber* filed a brief for the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

The administratrix of the estate of Walter J. Halecki brought this action against the owners of the pilot boat *New Jersey* to recover damages for Halecki's death, allegedly caused by inhalation of carbon tetrachloride fumes while working aboard that vessel. The action, based upon the New Jersey Wrongful Death Act, N. J. Stat. Ann. 2A:31-1, was brought in the federal court by reason of diversity of citizenship. Under instructions that either unseaworthiness of the vessel or negligence would render the defendants liable and that contributory negligence on the part of the decedent would serve only to mitigate damages, a jury returned a verdict for the administratrix, upon which judgment was entered. The Court of Appeals affirmed, holding that the New Jersey Wrongful Death Act incorporates liability for unseaworthiness, as developed by federal law, and adopts the admiralty rule of comparative negligence when death occurs as a

result of tortious conduct upon the navigable waters of that State. 251 F. 2d 708.

For the reasons stated in *The Tungus* v. *Skovgaard*, decided today, *ante,* p. 588, we hold that the Court of Appeals was correct in viewing its basic task as one of interpreting the law of New Jersey. For reasons also stated in *Tungus,* we accept in this case the Court of Appeals' determination of the effect which New Jersey law would accord to the decedent's contributory negligence. But even if the Wrongful Death Act of New Jersey be interpreted as importing the federal maritime law of unseaworthiness, the court was in error in holding that the circumstances of this case were such as to impose liability under that doctrine.

The essential facts are not in dispute. In September of 1951 the vessel was brought to Jersey City, New Jersey, for its annual overhaul at the shipyard of Rodermond Industries, Inc. One of the jobs to be done was the dismantling and overhaul of the ship's generators, requiring, among other things, that they be sprayed with carbon tetrachloride. Since Rodermond Industries was not equipped to do electrical work, this job was subcontracted to K. & S. Electrical Company, Halecki's employer.

The generators were in the ship's engine room, and both Halecki and his foreman, Donald Doidge, were aware of the necessity of taking special precautions in undertaking the job of spraying them with tetrachloride, a toxic compound.[1] They arranged to do the work on Saturday,

---

[1] Carbon tetrachloride, a somewhat volatile compound five times heavier than air, is toxic to humans if present in the atmosphere in concentrations of more than 100 parts to 1,000,000. It therefore is essential when working with this chemical to provide adequate ventilation, a task that is complicated because the density of the compound may result in a high concentration of the fumes in the lower portions of an enclosed area.

a day chosen because, as Doidge testified, "[W]e know it has to be done when there is nobody else on board ship."

Halecki and Doidge came aboard on the appointed day, equipped with gas masks. They found only a watchman, to whom they gave instructions not to permit anyone to enter the engine room. Before starting the job they rigged an air hose underneath the generators to blow the fumes away from the man spraying. A high-compression blower was placed so that it would exhaust foul air through one of the two open doorways. These pieces of equipment belonged to Rodermond Industries and had been brought aboard by Doidge and Halecki the previous day. Together with the engine room's regular ventilating system, the air hoses and blower were operated by electrical power supplied from the dock. Halecki did most of the spraying, working for 10- or 15-minute periods with intervening rests of equal length. The ventilating equipment was in operation, and Halecki wore a gas mask during the entire period that he worked. He became sick the next day and died two weeks later of carbon tetrachloride poisoning.

The eventful development of the doctrine of unseaworthiness in this Court is familiar history. Although of dubious ancestry,[2] the doctrine was born with *The Osceola*[3] and emerged full-blown 40 years later in *Mahnich* v. *Southern S. S. Co.*[4] as an absolute and nondelegable duty which the owner of a vessel owes to the members of the crew who man her. The justification for this rigid standard was clearly stated in the Court's opinion in *Mahnich*:

> "He [the seaman] is subject to the rigorous discipline of the sea, and all the conditions of his service

---

[2] See Gilmore and Black, The Law of Admiralty, p. 316.

[3] 189 U. S. 158, 175.

[4] 321 U. S. 96.

constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers." 321 U. S. 96, at 103.

With the nature of the duty thus defined, it remained for two other decisions of the Court to amplify its scope. *Seas Shipping Co.* v. *Sieracki* and *Pope & Talbot* v. *Hawn* [5] made clear that the shipowner could not escape liability for unseaworthiness by delegating to others work traditionally done by members of the crew. Whether their calling be labeled "stevedore," "carpenter," or something else, those who did the "type of work" traditionally done by seamen, and were thus related to the ship in the same way as seamen "who had been or who were about to go on a voyage," were entitled to a seaworthy ship. See 346 U. S., at 413.

Neither these decisions nor the policy that underlies them can justify extension of liability for unseaworthiness to the decedent in the present case. The work that he did was in no way "the type of work" traditionally done by the ship's crew. It was work that could not even be performed upon a ship ready for sea, but only when the ship was "dead" with its generators dismantled. Moreover, it was the work of a specialist, requiring special skill and special equipment—portable blowers, air hoses, gas masks, and tanks of carbon tetrachloride, all brought aboard the vessel for this special purpose, and none connected with a ship's seagoing operations. [6] Indeed, the work was so specialized that the repair yard engaged to overhaul the vessel was not itself equipped to perform it,

---

[5] 328 U. S. 85 and 346 U. S. 406. See also *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396, and *Rogers* v. *United States Lines,* 347 U. S. 984.

[6] It was established that the ship's own ventilating system was entirely adequate to perform its intended function of ventilating the engine room while the ship was in regular operation.

but had to enlist the services of a subcontractor. A measure of how foreign was the decedent's work to that ordinarily performed by the ship's crew is that it could be performed only at a time when all the members of the crew were off the ship.

It avails nothing to say that the decedent was an "electrician," and that many modern ships carry electricians in their crew. *Pope & Talbot* v. *Hawn* explicitly teaches that such labels in this domain are meaningless. See 346 U. S., at 413. It is scarcely more helpful to indulge in the euphemism that the decedent was "cleaning" part of the ship, and to say that it is a traditional duty of seamen to keep their ship clean. The basic fact is, in the apt words of Judge Lumbard's dissenting opinion in the Court of Appeals, that the decedent "was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed." 251 F. 2d 708, at 715. To extend liability for unseaworthiness to the decedent here would distort the law of *Mahnich,* of *Hawn* and of *Sieracki* beyond recognition. We therefore hold that it was error to instruct the jury that the shipowner could be held liable in this case even if they should find that the shipowner had exercised reasonable care.[7]

As to the claim based upon negligence, for which the New Jersey Wrongful Death Act clearly gives a right of action,[8] we agree with the Court of Appeals that "the evidence created an issue that could be decided only by a verdict." The defendants owed a duty of exercising rea-

---

[7] We do not reach the question, discussed in the *amicus curiae* brief of the United States, whether a shipowner can ever be liable for the unseaworthiness of a vessel "to a shore-based worker who performs labor on a ship which is not ready for a voyage but is out of navigation and docked in a private shipyard for its annual overhaul and repair."

[8] N. J. Stat. Ann. 2A:31-1; see *The Tungus* v. *Skovgaard, ante,* p. 588.

sonable care for the safety of the decedent. They were charged with knowledge that carbon tetrachloride was to be used in the confined spaces of the engine room. It was for the triers of fact to determine whether the defendants were responsibly negligent in permitting or authorizing the method or manner of its use.

It follows from what has been said that a new trial will be required, for there is no way to know that the invalid claim of unseaworthiness was not the sole basis for the verdict.

*Vacated and remanded.*

[For concurring opinion of MR. JUSTICE FRANKFURTER, see *ante,* p. 597.]

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS join, dissenting.

On September 29, 1951, the pilot boat *New Jersey* was standing at a pier in the Jersey City repair yard of a marine overhaul and repair firm for its annual overhaul. The overhaul job was scheduled to take three weeks, and the 29th was the Saturday after the first week of work. Crew members participated in maintenance work on the vessel during this period, on a five-day-work-week basis. Cleaning the vessel's generators was the work scheduled for the 29th, and since the cleaning work was to be done with carbon tetrachloride, known to have toxic properties, a Saturday was chosen for the job to minimize the number of persons aboard the vessel. Walter Halecki, respondent's decedent, was an employee of an electrical firm doing the cleaning job as a subcontractor to the general overhaul contractor; he and another employee of the subcontractor came aboard and spent the day spraying the generators in the ship's engine room. Halecki did most of the work in the engine room. The men wore gas masks

and from time to time rest periods above decks were observed. At the end of the day, Halecki complained of an odd taste in his mouth, and he was thereafter admitted to a hospital where he died of carbon tetrachloride poisoning.

His widow commenced this action against the vessel's owners in the Federal District Court for the Southern District of New York, predicating jurisdiction on diversity of citizenship. The complaint alleged unseaworthiness of the vessel in that harmful concentrations of carbon tetrachloride were allowed to stand in the engine room, unremoved either by the vessel's ordinary ventilation system or by auxiliary equipment brought aboard the vessel by the workmen for the purpose. It further alleged negligence in the failure to use reasonable care in furnishing the decedent, as a business invitee, a safe place to work. The New Jersey Wrongful Death Act was pleaded by the plaintiff to support these claims. The case went to the jury on both grounds, and a general verdict was returned for the plaintiff; judgment thereon was affirmed by the Court of Appeals.

The Court today reverses, holding that the verdict, which must of course be supportable on each aspect in which the case was left to the jury, cannot be supported on the grounds of unseaworthiness. The Court, following its decision in *The Tungus* v. *Skovgaard, ante,* p. 588, holds that the basic source of law in this case, since it is a wrongful death case, is the law of New Jersey. My separate opinion in that case sets forth the basis on which I think that that holding is erroneous. The Court in the present case holds, apparently as a matter of federal law, that the vessel did not owe any duty of seaworthiness to the respondent's decedent. Paradox may be found in this after the Court's characterization of the governing law as state law, and there well may be confusion as to the precise role that federal law is to play in these maritime death

actions as a result of the Court's holding.[1]  But in any event, since I view the unseaworthiness question as a matter of federal law, as apparently the Court does here, I shall set forth briefly the grounds on which I think it has clearly erred in the light of the decisions in *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85; *Pope & Talbot, Inc.,* v. *Hawn,* 346 U. S. 406, and *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396, none of which the Court today purports to overrule.

In *Seas Shipping Co.* v. *Sieracki,* the question was whether the duty of maintaining a seaworthy vessel extended to. persons who performed the ship's service aboard the vessel but who were not employed directly by the shipowner.  The Court concluded that this duty was "not confined to seamen who perform the ship's service under immediate hire to the owner, but extends to those who render it with his consent or by his arrangement." 328 U. S., at 95.  The Court declared that the "liability arises as an incident, not merely of the seaman's contract, but of performing the ship's service with the owner's consent." *Id.,* at 97.  The Court quoted with specific approval the language of the court below in that case: "when a man is performing a function essential to maritime service on board a ship the fortuitous circumstances

---

[1] Further paradox may be found in the Court's acceptance, without independent examination, of the view of the Court of Appeals for the Second Circuit as to the defenses available under the New Jersey Wrongful Death Act as applicable to the negligence claim here.  The Court of Appeals held contributory negligence unavailable as an absolute defense.  The usual reasons given for deferring to the Courts of Appeals on state law questions may not be entirely applicable to a circuit not embracing the State in question.  In the *Tungus* case, *ante,* p. 588, the Court today affirms a judgment of the Court of Appeals for the Third Circuit (which includes New Jersey) leaving open this identical issue for the District Court.  It would appear clear, in the light of the Court's disposition of this case, what the answer on this issue must be in the *Tungus* case.

of his employment by the shipowner or a stevedoring contractor should not determine the measure of his rights." *Ibid.* The Court stressed that the division of labor due to increased specialization did not operate to diminish the scope of the duty of maintaining a seaworthy vessel. The shipowner, it was said, "is at liberty to conduct his business by securing the advantages of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities." *Id.,* at 100.

In *Pope & Talbot, Inc.,* v. *Hawn,* the *Sieracki* doctrine was reaffirmed and applied in another fact situation, and it was pointed out that the protection of a shipboard worker by the duty of seaworthiness was not based on the title of the position he occupied in the doing of the shipboard work but "on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness." 346 U. S., at 413.

Today the Court holds that not all workers engaged in doing "ship's service" aboard a vessel are entitled to the warranty. It essays distinctions as to whether the ship's power is functioning at the time of the accident, whether the ship is ready for an immediate voyage.[2] It stresses

---

[2] A brief filed as *amicus curiae* by the United States urges that the doctrine of seaworthiness imports only a warranty of seaworthiness for a voyage, and that since the ship was not about to engage in a voyage, the duty was owed to no one at the time of the accident. This theory, like the Court's, would result in an unwarranted restriction of the *Sieracki* doctrine, particularly since there were crew members working aboard ship on a regular work week basis during the period in question who would be denied the doctrine's protection under the Government's theory. The Government's argument is based primarily on *Desper* v. *Starved Rock Ferry Co.,* 342 U. S. 187, where there was no issue of unseaworthiness and the vessels had been hauled up on land for the winter. In *Rogers* v. *United States Lines,* 347 U. S. 984, the duty of seaworthiness was held to be present in regard to a vessel which had completed a voyage and which was not shown to be about to embark on a new voyage.

that the work done by Halecki was specialized work on a modern vessel, of a sort which is now habitually contracted out. But it takes only a casual reference to the principles of the *Sieracki* decision to be reminded that the fact that a worker is doing specialized work on a modern vessel under a contract is no reason for exempting him from the scope of the seaworthiness duty's "humanitarian policy," 328 U. S., at 95; it is rather one of the very bases on which the *Sieracki* doctrine was bottomed. The Court refers to the extensive specialized equipment the contractor was required to bring aboard, but in *Petterson* this was, over dissent, rejected as a basis for distinction of *Sieracki*, 347 U. S. 396, 400. Nor would one think that the fact that the work being done posed dangers to a degree which made it desirable that the crew members not be present aboard the vessel militated against the existence of the seaworthiness duty. The duty was held in *Sieracki* to extend to others than members of the crew precisely to avoid the consequence that the shipowner would escape his responsibilities by contracting out dangerous work.

The Court declines to find that Halecki was engaged in ship's service of a sort that would entitle him to the warranty because the precise sort of work he was doing is one which is habitually contracted out. It rejects clear categorical analogies between Halecki's work and that historically done by crew members, with the observation that the work Halecki was doing was different because the vessel was modern, had complicated equipment, and required specialized treatment efficiently to perform the work on it. Thus the whole point of the *Sieracki* decision is turned around, and today's shipowner escapes his absolute duty because his vessel is modern and outfitted with complicated and dangerous equipment, and because a pattern of contracting out a sort of work on it has become established.

The Court gives no reason based in policy for its inversion of the *Sieracki* principle. I fear also that it gives no workable guide to the lower courts in this actively litigated field of federal law. They may now have the impression that some degree of specialization in the tasks performed by the injured shipboard worker disqualifies him from the scope of the shipowner's duty, but, further than that, there is left uncertain the extent to which the decisions of the lower courts based on the *Sieracki* and *Hawn* cases are now under a cloud.[3] And so confusion is left to breed further litigation in an already heavily litigated area of the law.

I would adhere to the principles of *Sieracki* and *Hawn* and affirm the judgment of the Court of Appeals.

[3] Cases in which holdings of the lower courts have interpreted this Court's decisions in the *Sieracki* and *Hawn* cases as extending the duty of seaworthiness to independent contractors' employees substantially similarly circumstanced to Halecki include *Torres* v. *The Kastor*, 227 F. 2d 664 (C. A. 2d Cir.) (cleaning vessel of pitch to make it suitable for future voyages); *Read* v. *United States*, 201 F. 2d 758 (C. A. 3d Cir.) (reconversion of Liberty Ship into troop carrier; worker engaged in converting deep tanks); *Crawford* v. *Pope & Talbot, Inc.*, 206 F. 2d 784 (C. A. 3d Cir.) (boiler cleaning company's employee cleaning accumulated rust and dirt from deep tank); *Pinion* v. *Mississippi Shipping Co.*, 156 F. Supp. 652 (D. C. E. D. La.) (plumbing repair contractor's helper carrying on home port repairs). See also *Pioneer S. S. Co.* v. *Hill*, 227 F. 2d 262, 263 (C. A. 6th Cir.) (vessel in winter lay-up; regular officers and crew not aboard; substantial repairs being effected; dictum that a shipfitter's helper "was probably within the broadened class of workers to whom the protection of the seaworthiness doctrine has now been extended"); *Imperial Oil, Ltd.*, v. *Drlik*, 234 F. 2d 4, 8 (C. A. 6th Cir.) (shipbuilding company employee engaged in repairing drydocked ship materially damaged by explosion; dictum that worker "would fall within the protection of the rule so extended"); *Lester* v. *United States*, 234 F. 2d 625 (C. A. 2d Cir.) (electrician working on general overhaul of drydocked vessel; extension of warranty assumed).