George R. FREEMAN, Libelant,

v.

**GREENVILLE TOWING COMPANY and THE Motor Vessel WALTER WILLIAMSON, her engines, tackle, etc., Respondent.**

**No. G–C–33–60.**

United States District Court
N. D. Mississippi,
Greenville Division.

Feb. 1, 1962.

Wynn, Hafter, Lake & Tindall, Greenville, Miss., for plaintiff.

Keady, Campbell & DeLong, Greenville, Miss., Lemle & Kelleher, New Orleans, La., for defendant.

CLAYTON, District Judge.

Libelant, George R. Freeman, combines in his libel three separate claims arising from personal injuries suffered by him on the morning of February 14, 1959. One of these claims is that his injuries were caused by unseaworthiness, another is that his injuries were caused by negligence of the respondent, and the third is for maintenance and cure. Respondent says that if there was unseaworthiness, it was caused completely by libelant, that if there was negligence, it was wholly the negligence of libelant, and that, therefore, respondent is not liable. It also says that it fully met its responsibilities with respect to maintenance and cure. On these sharply conflicting positions, the case was tried to the Court and submitted on briefs. The evidence presents little, if any, controversy material to a disposition of the case.

Freeman had worked with marine engines since 1951 and had been an

engineer aboard another vessel operated by respondent for more than seven years, until he was transferred to the WALTER WILLIAMSON in December, 1958. He claimed to be only an engineer, while respondent claims that he was the Chief Engineer aboard this vessel. It is without dispute that from the standpoint of length of service or seniority, he was the senior engineer aboard the WALTER WILLIAMSON and the weight of the evidence shows that he was the Chief Engineer during the period with which we are concerned.

The WALTER WILLIAMSON came into the harbor at Greenville, Mississippi, for a "short overhaul" of her engines on orders of respondent's port engineer. This overhaul involved repair of only the central sections of the engines and did not require dry docking of the vessel. The work was undertaken at the docks of Marine Welding and Repair Works, a separate corporation, but closely associated with Greenville Towing Company, since the two corporations had some common stockholders, directors, and officers. The work was supervised and directed by personnel of Marine, but some of the work was done by the engineers of the WALTER WILLIAMSON and some of the deck hands of the crew of this vessel. Work was conducted on a 24 hour basis and it was estimated to take about five days. Because of his senior position, Freeman drew a shift or "watch" during daylight hours and worked with the day crew of Marine. At night, another engineer of the WALTER WILLIAMSON remained aboard and worked with the night crew of Marine. These engineers represented respondent during the progress of the repair work, but the work was directed and controlled by Marine. Respondent's port engineer made the arrangements with Marine for the overhaul job and was on the boat daily during the course of the overhaul to inspect and keep in touch with the progress of the work and in part direct it. A third engineer member of the crew of the Walter Williamson was also on duty at night assisting in the overhaul.

The sequence of the work on the starboard diesel engine, with which we are concerned, was that it was disassembled and then the "dirty work", which was done only by the members of the crew of the Walter Williamson, consisting of scraping, washing, and drying of the engine was done. The drying or wiping, apparently, was done before, during and after reassembly of the engine. The washing phase, which was done by hosing diesel fuel onto the engine, was done when Freeman was not aboard. This washing operation was completed shortly after midnight, but the date when this was completed is not fixed with certainty by the evidence. This probably was on the night of 11–13 February, since it is clear that this engine was not fully reassembled until the night of 13–14 February. At the completion of the washing or hosing, respondent's port engineer was present and directed the force then on duty to "let it set".

Freeman personally participated in the wiping or cleaning after the washing, during the course of reassembly of this engine, but he was not personally present when the reassembly was completed on the night of 13–14 February. After this reassembly was completed, unsuccessful efforts were made that night, over a period of several hours, to start this engine. These efforts failed because of an inadequate air supply and further minor work was done on the air compressor and air box. Apparently this was completed at about 7:00 A.M. since it is without dispute that when Freeman came aboard at that time on the morning of February 14, the covers were being put on the air box of the engine. It is also without dispute that Freeman was then told by one of the night engineers that the engine was ready to crank, and the crew chief of the personnel of Marine discussed with Freeman who would start the engine and then requested that Freeman start it, since he was the engineer aboard.

It is also without dispute that in undertaking to start this engine, Freeman followed the usual and customary proce-

dure by starting the air pump first, then the lubrication oil pump, and that as the engine started, fire started coming out of the engine and then there was a violent explosion.

Respondent makes much of the undisputed fact that Freeman participated in the wiping down or cleaning of the air box before this engine was reassembled by the night force, since it is almost without question that the explosion was caused by the presence of diesel fuel inside the air blower of the engine which got there during the washing or hosing down, and which should have been wiped or cleaned away before complete reassembly of the air box. However, Freeman was in no sense in charge of this work and the evidence shows that Freeman was not even present when the plates were replaced on the air box in the course of reassembly. This was done by the night force during the early part of the night of 13–14 February.

Careful consideration of all of the evidence and circumstances leads to the almost inescapable conclusion that the night force negligently reassembled the air mechanism of this engine by failing to use reasonable care to ascertain that the air blower was free of an excess of diesel fuel, which everyone knew had been used in washing or hosing down this engine, and, that this negligence made this engine unseaworthy at the time when Freeman was told unequivocally that the engine was ready to start. Hence, it is clear that respondent is liable to Freeman for all of the damages sustained by him by reason of his personal injuries which were caused by this explosion, as well as for maintenance and cure. This liability attaches under both general maritime law and the Jones Act.

To sustain this conclusion with respect to general maritime law, only one recent case decided by the Supreme Court need be cited. That is the case of Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 940, 4 L.Ed.2d 941, which was decided in 1960. Some of the language of that opinion seems pertinent here:

"In 1944 this Court decided Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. While it it possible to take a narrow view of the precise holding in that case, the fact is that Mahnich stands as a landmark in the development of admiralty law. Chief Justice Stone's opinion in that case gave an unqualified stamp of solid authority to the view that The Osceola [189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760] was correctly to be understood as holding that the duty to provide a seaworthy ship depends not at all upon the negligence of the shipowner or his agents. Moreover, the dissent in Mahnich accepted this reading of The Osceola and claimed no more than that the injury in Mahnich was not properly attributable to unseaworthiness. See 321 U.S., at 105–113, 64 S.Ct. at page 460–463.

"In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, the Court effectively scotched any doubts that might have lingered after Mahnich as to the nature of the shipowner's duty to provide a seaworthy vessel. The character of the duty, said the Court, is 'absolute'. 'It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy.' 328 U.S. at pages 94–95, 66 S.Ct. at page 877. The dissenting opinion agreed as to the nature of the shipowner's duty. * * * '(D)ue diligence of the owner,' it said, 'does not relieve him from this obligation.' 328 U.S., at page 104, 66 S.Ct. at page 822.

"From that day to this, the decisions of this Court have undeviatingly reflected an understanding

that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, [523] 3 L.Ed.2d 541.

"There is no suggestion in any of the decisions that the duty is less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port, or that the duty is any less with respect to an unseaworthy condition which may be only temporary. Of particular relevance here in Alaska Steamship Co. v. Petterson, [347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798,] supra. In that case the Court affirmed a judgment holding the shipowner liable for injuries caused by defective equipment temporarily brought on board by an independent contractor over which the owner had no control. That decision is thus specific authority for the proposition that the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. That decision also effectively disposes of the suggestion that liability for a temporary unseaworthy condition is different from the liability that attaches when the condition is permanent."

And, to demonstrate the finding of negligence and liability resulting therefrom only Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 176, 77 L.Ed. 368 need be cited. In that case, Mr. Justice Cardozo said as follows:

"The act for the protection of railroad employees does not define negligence. It leave that definition to be filled in by the general rules of law applicable to the conditions in which a casualty occurs. Cf. Murray v. Chicago & N. W. R. Co. (C.C.) 62 F. 24, 31; Ward v. Erie R.R. Co., 230 N.Y. 230, 234, 129 N.E. 886; [People of State] Michigan, [by Haggerty] v. Michigan Trust Co., 286 U.S. 334, 343, 52 S.Ct. 512, 76 L.Ed. 1136, [1139]. Congress did not mean that the standards of legal duty must be the same by land and sea. Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that the negligent omission to fulfill it shall have resulted in damage to his person. When this concurrence of duty, of negligence and of personal injury is made out, the seaman's remedy is to be the same as if a like duty had been imposed by law upon carriers by rail."

The negligence of respondent in this case seems clear. The engineer of the WALTER WILLIAMSON who was present during the night of 13–14 February, when the reassembly was first completed and when the first effort to start the engine was made, and who was also present when the washing down began, was unfamiliar with this type of diesel engine and did not, therefore, know the danger inherent in allowing diesel fuel to be hosed through the opening between the air box and the blower. He and the other personnel of respondent were in a position to see and should have seen that this opening was not closed and their failure to notice this fact, their failure to close the opening and their allowing diesel fuel to be hosed into the opening and their failure to wipe or clean away this diesel fuel all constituted negligence, and this negligence caused the unseaworthy condition and the explosion to result.

While a judgment for libelant is supportable on both the claim made under general maritime law and the claim made under the Jones Act, libelant may recover only once. Gilmore and Black, The Law of Admiralty, 289.

Respondent contends that most of libelant's present condition is caused by his injury and ailments which happened or existed before the explosion. For the same reason they say that most of the expense incurred for hospitalization and surgery was brought about by the injury and ailments ante-dating February 14, 1959—merely pre-existing conditions which were aggravated by that event. In the light most favorable to respondent, the evidence shows that in 1958, while carrying some equipment in his arms to one of respondent's vessels upon which he then was employed, libelant's foot slipped and he had thereafter, for a short time, what he described as a "catch" in his back. He lost no time from his work with respondent because of this incident and made no claim on account of it. Later that same year he had a hernia operation and shortly after his release from the hospital, he suffered a "foot drop" of the right foot for which his doctor prescribed the wearing of a leg brace. Freeman may have worn this leg brace off and on until the time when he first came aboard the Walter Williamson in December of 1958. However, he lost no time from his work with respondent as an engineer aboard a motor vessel because of this condition. In 1950 Freeman was operated on for duodenal ulcer and has since sporadically taken medication for this condition prescribed by his physician. No time was lost by him from his work with respondent because of this. He suffered headaches which he considered of the normal average type, irregularly, and got relief from them by taking aspirin or bufferin. His personal physician testified that there were no limitations on his physical activities from the ulcer or "foot drop". Years before the time with which we are concerned, he may have suffered fainting spells in military formations during World War II. This is a fair description of libelant's condition before February 14, 1959. He did not wear a brace on his leg after coming aboard the Walter Williamson and he worked full time and regularly through the "day watch" or shift which ended in the late afternoon before the explosion occurred the following morning.

Freeman had no recollection of what had occurred after the moment when it seemed to him "all the lights went out in the engine room" until he realized he was in the after hold of the vessel some 20 to 25 feet from where he had been before. He was immediately hospitalized with extensive burns thought to be the chief complaint and remained in the hospital for about 35 days. These burns were about the face, neck, upper extremities and feet. They were second degree over the neck, face, chin and ears, third degree on his hands, and second and third degree on his feet and ankles. Principal efforts were directed toward treating the burns, but during this period of hospitalization a bruise was discovered across his hip and he was given pain relieving drugs for pain in his hip. During this first hospitalization, he began to develop violent headaches and had several falling episodes. It is without dispute that he has stiffness in the right hand and its fingers because of the burns and it is clear that he suffered a hearing loss in both ears as a result of this explosion, which amounts to about 13.8% with the left ear being worse.

At the time of his discharge from the first period of hospitalization, his attending physician was of the opinion that he had an undiagnosed disorder of the central nervous system. In consequence of this view, this physician referred libelant to a neurosurgeon who performed a laminectomy. Before this operation, libelant had attempted to work, but was unable to do so. After this operation, he again attempted to work aboard a vessel, but was able to stay only about one day and had to leave because of his condition.

The neurosurgeon referred Freeman to an orthopedic surgeon who performed two operations on Freeman's back to effect a fusion of some of the vertebrae in the lower lumbar region. At least one more such operation may be necessary.

Altogether libelant has been hospitalized 178 days since the explosion and it is clear that he now is, from a practical standpoint, wholly disabled. Headaches of increasing intensity have continued to occur with frequency since the explosion. When these episodes occur, Freeman "blacks out" convulsively and has done so approximately 30 to 40 times since February 14, 1959. His only relief for this condition is heavy medication which must be administered often by trained personnel at a hospital. His back has limited motion and causes pain a substantial part of the time. He gets some relief from this by lying down. It is patent as well that this man has undergone a marked personality change or deterioration to such an extent that he is sometimes unable to evaluate his own condition properly or relate it to reality. Altogether the testimony of seven physcians was presented on the trial and their professional opinions are varied and in hopeless conflict. The weight of all the evidence indicates persuasively and rather strongly that there is little hope for future improvement substantial enough to be given much consideration here. In fact, it seems probable that his condition will progressively worsen rather than improve. It is without doubt that he will require continued medical treatment and medication, probably for the rest of his life. It is also probable that additional surgery and hospitalization will be necessary in the future.

It is possible, but it does not seem at all probable, that libelant's pre-existing condition played an appreciable part in bringing about this present condition. But, if the explosion did in fact cause an aggravation of a pre-existing condition, and if the pre-existing condition were of a substantial character, respondent would nevertheless be liable for that part of the present condition attributable to the aggravation. As aforementioned, however, respondent can gain little benefit from libelant's condition which pre-existed the explosion, since it is obvious that without the injury in the explosion there is nothing in the record to suggest that Freeman's condition would have worsened in any way.

From all of the evidence, facts, and circumstances, it is more reasonable to say that substantially all of the injuries and disabilities, the hospitalization, medical treatment and surgery all are causally related to the explosion of February 14, 1959, and proximately resulted therefrom.

From what has been said, it follows that libelant is entitled to recover full damages, or such a sum of money as will reasonably and adequately compensate him for all the injuries suffered by him as a result of the trauma sustained in said explosion, as well as his traditional maintenance and cure. The elements of these damages and the factors which influence determination of the lump sum to be awarded (exclusive of maintenance and cure) will be first outlined.

■ Libelant is entitled to compensation for pain and suffering to date and for that which probably will occur in the future; for disability and loss of earnings to date and for such disability and loss of earnings as probably will occur in the future, as the latter element may be calculated from the history of earnings and presently determinable loss of earning power. These are such well known elements of damage that citation of authority is not required to support their consideration.

A determination of the amount to be awarded libelant as compensation for the foregoing elements of damage also requires consideration of the fact that he was earning approximately $6,000 a year and that the life expectancy, at the time of the explosion, for a man his age according to a standard mortality table, was 26.81 years. And, as this court

judicially knows, he probably then had an earning expectancy of about 17 years.

Considering all the facts and circumstances, and all the foregoing elements of damage and the factors which bear on them, excluding maintenance and cure, and discounting that part for which the award will be payment in advance, libelant is entitled to compensatory damages in the amount of $53,300 which is hereby fixed as the award for that purpose.

■ As to maintenance and cure, respondent paid all expense for the initial 35 day period of hospitalization and paid the full salary of libelant through July 15, 1959; and, libelant makes no claim for maintenance for that period. Thus, consistent with the foregoing findings of fact and conclusions of law, libelant is entitled to cure in an amount to cover necessary hospital and medical expense incurred since the first period of hospitalization to the hearing and for maintenance the standard per diem of $6 for each day from July 15, 1959, to the hearing. By stipulation, medical and hospital expense for this period was established at $7,109.29 and proof was made for $442.72 more. Hence, cure is fixed at $7552.03. From July 16, 1959, through October 16, 1961 (the date of the hearing) amounts to 824 days, from which 120 days of hospitalization for libelant must be deducted, since the expense therefor is included in the foregoing total for cure. Thus, there are 704 days for which libelant is due maintenance. Hence, maintenance due libelant is fixed at $4224.

The total of the amounts heretofore fixed by way of compensatory damages, cure and maintenance is $65,076.03, and this amount is fixed as the total to be recovered by libelant from respondent for all claims asserted by him in this case.

Decree may be prepared accordingly.

To the extent that the opinion of this court dated the 29th day of December, 1961, differs from this opinion it is withdrawn and this opinion substituted therefor.