**Melvin McCOWN, Plaintiff,**

v.

**HUMBLE OIL & REFINING COMPANY, Defendant.**

**Civ. A. No. 1030.**

United States District Court
E. D. Virginia,
Newport News Division.

Dec. 8, 1967.

Louis Ellenson, Alvin B. Fox, Ellenson & Fox, Newport News, Va., for plaintiff.

William McL. Ferguson, Newport News, Va., John W. Winston, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for defendant.

## MEMORANDUM

MacKENZIE, District Judge.

The doctrine of "unseaworthiness" of a vessel as establishing liability on a shipowner in favor of a crew member is now too well settled to need comment, except that in the application of such doctrine to non-members of the crew, a restatement of the basic concept can be of value. In Mahnich v. Southern S. S. Co.,[1] a standard was evolved and is expressed in an oft-quoted paragraph 321 U.S. on page 103, 64 S.Ct. on page 459 of the opinion in this fashion:

> "He [seaman] is subject to the rigorous disciplines of the sea, and all conditions of his service constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers".

McCown was not a member of the ship's crew, but was an employee of Newport News Shipbuilding and Drydock Company and was working aboard. To avail himself of the benefits of the unseaworthiness rationale afforded a seaman he must, therefore, identify the work being done by him at the time of the accident, to be such work as is traditionally done by the ship's crew. In the words of Sieracki,[2] as a shore worker, McCown must have been "* * * in short, a seaman doing a seaman's work and incurring a seaman's hazard". We recognize that McCown was a "rigger", an employment rating fairly low in the shipyard pay scale, and that at the time of the accident he was menially engaged in sweeping and cleaning a tank, a common place seaman's labor. All of this was part of the inner tank sandblasting which was, in turn, part of the tank coating process. Under the reasoning of

---

1. 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

2. Seas Shipping Co. v. Sieracki (1946) 328 U.S. 85, at page 99, 66 S.Ct. 872, at page 880, 90 L.Ed. 1099.

West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), when work is being done under a very complex and technical contract by a shoreside expert organization, the test is not to analyze which individual employee handles the metallurgy and which handles the sandblasting, broom and the vacuum cleaner if it is all part of a single pattern of repairs.

This immediate endeavor of McCown was but an integral part of a highly specialized process of applying zinc tank coating. It would seem therefore that "the focus should be upon the status of the ship, the pattern of repairs, and the extensive nature of the work contracted to be done, *rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury*". (Emphasis added.) West v. United States (1959) 361 U.S. 118, page 122, 80 S.Ct. at page 192. A job analysis based upon what a particular workman was doing at a particular time, says *West,* supra, " * * * would lead to fortuitous results" (page 122, 80 S.Ct. page 192).

Here, McCown was injured when struck by a suction hose supplied by Newport News Shipbuilding and Drydock Company, McCown's employer, when the hose fell from a beam aboard the ship where it had been placed by other shipyard employees. The hose was part of special equipment costing in excess of $390,000.00, owned and put aboard the vessel by the Newport News Shipbuilding and Drydock Company to accomplish a tank coating operation. The tank coating phase of the extensive contract cost more than $241,000.00 and it was in this portion of the contract that the plaintiff was involved when injured. The work called for expensive, complicated equipment requiring specially trained personnel and supervision and using a process which had only recently

been invented. It has never been done by a ship or on a ship underway. None of the equipment belonged to the ship. None of the personnel involved in the process of the actual coating or in the preparation of the tanks were members of the ship's crew. The dehumidifying processes had to be carefully instituted and controlled by shore-based employees of the shipyard. Sandblasting was necessary to prepare the metal surfaces for the coating with zinc of a thickness of .005 of an inch by special equipment.

McCown was involved in this tank coating process, a work which in its overall nature had never been done by a seaman, had never been part of a seaman's hazard, nor a working condition, in *Sieracki* words, which a seaman as an adjunct of sea service had ever been constrained to accept. Raidy v. United States, 153 F.Supp. 777, (D.C. Md.1957); United N. Y. & N. J. Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 614, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959). In short, McCown, in the judgment of this Court, was not a *Sieracki* seaman and not entitled to any warranty of seaworthiness from the shipowner. This is an industrial accident to which Congress has addressed the appropriate Workmen's Compensation Acts and this shipyard worker should seek his redress there. We cannot approximate McCown, a shipyard employee engaged in a complex, technical work, requiring specialized shipyard equipment put aboard the vessel by the shipyard, to the stevedore injured during loading operations by faulty ship equipment in Seas Shipping Co. v. Sieracki;[3] or to the carpenter injured repairing ship's loading equipment, during loading, in Pope & Talbot v. Hawn;[4] or to the stevedore injured during loading by ship's hatch cover in Atlantic Transport Co. of West Virginia v. Imbrovek;[5] or the stevedore injured

3. 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

4. 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

5. 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914).

by faulty ship's topping lift in loading in Crumady v. J. H. Fisser.[6]

Furthermore, the ESSO BERMUDA, was not in navigation at the time of this accident.

The contract between the shipowner and Newport News Shipbuilding and Drydock Company was for extensive repairs, renewals and renovations of which the tank coating was only a part. The total work, cost $407,194.00, was executed alongside the dock at the shipyard on an availability of thirty-five (35) days, from August 8, 1961 through September 12, 1961.

During those thirty-five (35) days, the ESSO BERMUDA was a "dead" ship, unable to move under her own power. Her main propulsion engines were torn down, her boilers and valves overhauled. Shipyard employees worked inside her main boilers. All utilities, power, steam, electricity and fresh water were supplied from the dock by the shipyard. She was completely servient to the shipyard for sustenance, fire protection and movement.

The work to be accomplished encompassed not only the extension tank work and the engine room repairs elsewhere described, but also her conventional steam smothering system for fire fighting was entirely replaced by a foam system; much of her cargo piping system was removed and replaced.

In addition, the crew, while remaining on board, used the lay-up time for vacations. For much of the thirty-five (35) days period there were present on board only a total of three deck and engine room ratings, though the required sailing complement numbered fifteen (15). The fact that some of the crew remained aboard offers no compelling reason that the vessel was in navigation, but on the contrary, points, in the insufficiency of the sailing complement, that the vessel was indeed out of navigation. Madden v. United States, 259 F.Supp. 663 (D.C.Mass., 1966).

The evidence is clear that the shipowner had no control over the vessel in the shipyard as to the work contracted for, except to see that the contract requirements were met. The ship's officers and crew did not participate in the work being done, gave no orders, nor supervised its progress. The signing for the work on its completion by the Captain was simply in the nature of a receipt.

McCown raises the argument that even if the vessel had been removed from navigation, this accident occurred after much of the work disabling the vessel had been accomplished and the ship should be considered as having been returned to navigation. This has been answered by Judge Learned Hand, in Latus v. United States, 277 F.2d 264, (2 Cir.1960), at page 266:

"* * * we cannot agree * * * that a ship is progressively returned to service as to those parts of her on which the necessary restoration has been done. The warranty of seaworthiness has never been divided into fragments; a ship is either fitted for her duties in all respects, or she is not fitted at all. * * *"

The ESSO BERMUDA was not in the shipyard for either the short time of 8 days and minor repairs, as in Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599 (2 Cir.1960); nor the routine maintenance in Allen v. Union Barge Line Corp., 239 F.Supp. 1004 (D.C.La.1965) nor for voyage repairs or annual inspection as in Morrell v. United States, 193 F.Supp. 705 (D.C.Cal.1960).

Counsel for defendant will present a proper order in accordance with this memorandum, sustaining the motion of the defendant for summary judgment in favor of the defendant, and overruling the cross-motion for summary judgment of the plaintiff.

6.  358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).