**Edward J. ROMERO**

v.

**BETHLEHEM STEEL CORPORATION**
**et al.**

**Civ. A. No. 7982.**

United States District Court,
E. D. Texas,
Beaumont, Division.

Jan. 4, 1974.

Darryl J. Tschirn, New Orleans, La., for plaintiff.

O. J. Weber, Jr., Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for defendants, Bethlehem Steel Co. and J. Flanagan.

Richard D. Davis, Royston, Rayzor, Cook & Vickery, Galveston, Tex., for defendant, Trident Maritime Agency, Ltd.

## MEMORANDUM DECISION

STEGER, District Judge.

The plaintiff, Edward J. Romero, instituted this action for damages against his employer, Bethlehem Steel Corporation (hereinafter called Bethlehem), the owners of the vessel on which he was working, Trident Maritime Agency Ltd.

(hereinafter called Trident), and the Stevedore, J. Flanagan, in the Western District of Louisiana on July 10, 1972. The Court's admiralty and maritime jurisdiction was predicated upon claims of unseaworthiness in accord with Rule 9(h) of the Federal Rules of Civil Procedure and upon general maritime negligence. In his complaint, the plaintiff contended that Bethlehem and/or Trident and/or J. Flanagan were negligent in failing to provide him with a safe place to work and that the vessel upon which he was working, the M/V ST. PATRICK # 3103, was maintained in an unseaworthy condition.

The action was transferred to the Eastern District of Texas on October 25, 1972, on the basis of forum non conveniens. Subsequently, this Court dismissed the plaintiff's action against J. Flanagan and Bethlehem on April 24, 1973.[1] On April 18, 1973, Trident filed a cross claim for indemnity against Bethlehem contending Bethlehem breached its warranty of workmanlike performance. On September 12, 1973, the case was tried to the Court in this posture. At the conclusion of the evidence on September 13, the Court directed the parties to file briefs and proposed findings of fact and conclusions of law by October 8, 1973.

The following shall constitute the Court's findings of fact and conclusions of law.

### FACTUAL BACKGROUND

The plaintiff, Edward J. Romero, was employed as an outside machinist at Bethlehem's shipyard in Beaumont, Texas, at the time of his injury on June 10, 1971. Romero was working aboard the M/V ST. PATRICK while the vessel was in Bethlehem's submersible drydock. Romero's duties consisted of opening sea valves, working on the propeller shaft, checking the bearings, and working on the vessel's generators.

The ST. PATRICK was in Bethlehem's drydock from 9:45 A.M. on June 9, 1971, to 4:45 P.M. on June 12, 1971. During this time, some forty-seven repair items were accomplished by the shipyard at a cost of approximately $41,000.00. Specifically, the propeller was removed and replaced, the zinc plates on the rudder were renewed, the pit sword was removed, the load lines were inspected, the sea valves were opened, shaft wear readings were taken, the load lines were inspected, doublers on the upper ballast tank were installed, the port bilge keel was repaired and the bottom of the vessel was sandswept. While these repairs were being made, the ST. PATRICK was on shore power with the full crew remaining on board.

From the time of the injury, the plaintiff has put forth conflicting theories of how his back injury occurred. In the initial report of accident, the first aid report, the claim for compensation under the Longshoremen and Harborworkers' Act and his June 14, 1971, report to Dr. Stephenson, he said that he was using a twenty pound sledge hammer in the shaft alley to remove a coupling and he pulled a muscle in his back. This was due to the weight of the sledge hammer and the cramped position in which he was working. Then on July 19, 1971, he saw Dr. Brown and added that he also injured his back when he assisted two other men in carrying a 200 pound wrench up and down two or three ladders. When Dr. Stephenson saw the plaintiff a year later on June 6, 1972, Romero told him that he strained his back while using the sledge hammer in the shaft alley and then a second time when he was carrying a wrench down a flight of stairs. He told Dr. Stephenson that he did not fall or strike his back on anything. This was essentially the same

---

1. The plaintiff's action against J. Flanagan was dismissed because they were not exercising any control over the repair operations at the time of the injury and were not the cause of any unseaworthy condition aboard the vessel. Bethlehem was dismissed because they were a subscriber under both the Texas Workmen's Compensation law and the Longshoremen and Harbor Workers Act.

story he told Dr. Vogel on August 17, 1972.

When the plaintiff's deposition was taken on March 1, 1973, he put forth a new theory of liability. He stated that he was carrying a large wrench with Mr. Cagle up three flights of stairs and when he reached the second flight, he slipped on a spot of grease and fell all the way to the step. He made no reference whatsoever in his deposition to any injury while swinging a sledge in the shaft alley. In fact, he claimed that his *only* injury to his back occurred when he slipped on the spot of grease.[2]

At the trial of the case the plaintiff relied on two theories for recovery. The plaintiff said that he first strained his back while swinging a sledge hammer in a close place in the shaft alley and a second time when he slipped on a spot of grease on the stairway.

After considering all of the evidence presented at the trial of this case, the Court finds that the testimony of the plaintiff and Weldon Cagle concerning the grease on the stairway is counterbalanced by other testimony and documentary proof. Therefore, the Court concludes that there was but one injury suffered by the plaintiff on June 10, 1971, and that occurred while he was removing couplings in the shaft alley of the M/V ST. PATRICK. The evidence supports this conclusion.

## THE JURY QUESTION

The plaintiff urges in his posttrial memorandum that he is entitled to a new trial because the case was tried to the Court instead of to a jury. He contends that jurisdiction for his negligence claim was based on diversity of citizenship entitling him to a trial by jury. The Court is of the opinion that the plaintiff is not entitled to a jury trial on either his negligence or unseaworthiness claims.

The pertinent portions of the plaintiff's complaint[3] clearly identified his claim as one arising under general admiralty and maritime law. In his complaint, the plaintiff did not plead diversity of citizenship as an alternative basis for jurisdiction, nor did he seek to amend the complaint to allege these additional grounds. Even if the plaintiff had amended his complaint to add diversity grounds, the Court finds that his demand for a jury would be stricken if his Rule 9(h) admiralty claim remained. Americana of Puerto Rico, Inc. v. Transocean Tankers Corporation, 317 F.Supp. 798 (D.P.R.1969); Williams v. Shipping Corporation of India, Ltd., 354 F.Supp. 626, 629 (S.D.Ga.1973); Alaska Barite Company v. Freighters Incorporated, 54 F.R.D. 192 (N.D.Cal.1972). The Court finds that the plaintiff made no attempt to withdraw the original admiralty and maritime basis for jurisdiction or

2. At the close of his deposition he testified as follows:
"Q. And as I understand your testimony, you just got one injury there at Bethlehem Steel Corporation?
A. My back hurt.
Q. Yes, sir, you just got hurt one time at Bethlehem Steel Corporation?
A. Yes, sir.
Q. And you hurt your back?
A. Yes, sir.
Q. And you got it hurt in the way you have told us about today?
A. Yes, sir."

3. "SUIT ON BASIS OF GENERAL MARITIME NEGLIGENCE AND UNSEAWORTHINESS
"Complainant, EDWARD J. ROMERO, a person of full age of majority and a citizen of the United States, residing in Starks, Louisiana, through undersigned counsel, brings this action against BETHLEHEM STEEL CORPORATION, TRIDENT MARITIME AGENCY, LTD., and J. FLANAGAN, and in the cause of general maritime tort and unseaworthiness, with respect, represents:

I.

"Complainant alleges a cause of action based upon negligence in accord with general maritime law and a second cause of action on the grounds of unseaworthiness in accord with Rule 9(h) of the Federal Rules of Civil Procedure."

to invoke the provisions of Rule 15. Under these circumstances, he is not entitled to a trial by jury. Williams v. Shipping Corporation of India, Ltd., supra, 354 F.Supp. at 630; Alaska Barite Company v. Freighters Incorporated, supra, 54 F.R.D. at 194.

Finding the plaintiff not entitled to a trial by jury, the Court will now turn to the merits of the case.

## WARRANTY OF SEAWORTHINESS

■ A seaman's action for breach of the warranty of seaworthiness was first recognized by the Supreme Court in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1896). The right to sue the owner of an unseaworthy vessel was later extended in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), to cover shore based workers such as Romero. The broad reach of *Sieracki* was later confined by the Supreme Court in West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L. Ed.2d 161 (1959), and United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S. Ct. 517, 3 L.Ed.2d 541 (1959). In *West* the Court said that in deciding whether the warranty applies in any given case you examine, "the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury." 361 U.S. at 122, 80 S.Ct. at 192. The decisions in this Circuit after *West* have formulated a two pronged test that a landbased work must pass before liability is established.

First: Did the vessel remain "in navigation," and;

Second: Was the repair project, taken as a whole, one that has been historically performed by seamen? See Waganer v. Sea-Land Service, Inc., 486 F.2d 955 (5th Cir. 1973); Rogers v. United States, 452 F.2d 1149 (5th Cir. 1971); Delome v. Union Barge Line Company, 444 F.2d 225 (5th Cir. 1971); Drake v. E. I. DuPont deNemours & Company, 432 F.2d 276 (5th Cir. 1970). To recover in the case at bar, the plaintiff must satisfy *both* of the requirements set out above.

### A. *The ST. PATRICK Was in Navigation.*

■■ Whether a vessel is "in navigation" is a question of fact, to be decided by the factfinder. Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L. Ed.2d 1 (1961); Waganer v. Sea-Land Service, Inc., supra. In deciding the question of the status of the vessel, several factors are important.

One such factor is the extensive nature of the repairs and their cost to the shipowner. The more expensive, time consuming and extensive the repairs, the more likely the vessel has been withdrawn from navigation. On the other hand, "a vessel which temporarily leaves commerce, enters a shipyard for minor repairs, and thereupon returns to commerce remains in navigation for purposes of the warranty." Delome v. Union Barge Line Company, supra, 444 F. 2d at 232. In the instant case, the M/V ST. PATRICK was in Bethlehem's shipyard for about three days during which some $41,000.00 in repairs were completed on her. The vessel was put in drydock and was on shore power during the repairs. As noted previously there were some forty-seven repair items accomplished with the main work being done on the propeller and the rudder.

■ Another factor to consider is the control over the repair operations at the time of the injury. Lack of supervisory authority by members of the crew is not controlling by itself, but it is important in deciding whether the vessel remained in navigation. Erwin v. Lykes Brothers Steamship Co., 472 F.2d 1217, 1219 (5th Cir. 1973). In this connection, the Court finds that the crew of the ST. PATRICK remained on board the vessel during the repair operations, but that they did not exercise any control over Bethlehem's employees. The plaintiff's

crew looked to Bethlehem supervisors for direction as to how the job should be accomplished.

After considering all the evidence presented by the parties, the Court concludes that the vessel remained in navigation because: (1) The vessel was withdrawn from commerce for only three days, (2) the crew remained on board the entire time, and (3) the dollar cost of the repairs was small in relation to the total value of the vessel.

The Court will now turn to an examination of the pattern of repairs which is the second half of the inquiry. The plaintiff must show that the pattern of repair work being done by Bethlehem was that traditionally done by seamen.

### B. *The Repair Project Was Not One Ordinarily and Traditionally Done by Seamen.*

The Supreme Court limited the duty of seaworthiness outlined in *Sieracki* in its decisions in United New York and New Jersey Sandy Hook Pilots Association v. Halecki, supra and West v. United States, supra. In *Halecki* the Court held that the warranty of seaworthiness did not encompass those shipyard workers who were not performing the traditional duties of a seaman. The Court denied the warranty in *Halecki* because overhauling the ship's generators required special knowledge and equipment and could not normally be performed at sea by the average seaman.

The inquiry by this Court must be focused upon the work being done aboard the ship by all of Bethlehem's employees, instead of the specific task that Romero was performing at the time of his injury. See Delome v. Union Barge Line Company, supra; Watz v. Zapata Off-Shore Company, 431 F.2d 100, 107 (5th Cir. 1970); Waganer v. Sea-Land Service, Inc., supra, 486 F.2d at 959. To recover the crew must, "be engaged in work traditionally that of a seaman, . . . excluding those persons performing such tasks as making major repairs requiring drydocking or

special skills." Atkins v. Greenville Shipbuilding Corporation, 411 F.2d 279, 282 (5th Cir. 1969); cert. denied, 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96 (1969).

Applying these principles to the facts in this case, it appears to the Court that the shipyard workers, including the plaintiff, were not performing the traditional duties of seamen and, therefore, no warranty of seaworthiness was owed the plaintiff.

The repairs being accomplished during the three day period were numerous and required the drydocking of the ST. PATRICK for their completion. These repairs required specialized skills not normally possessed by seamen and equipment not normally found appurtenant to the vessel. In short, this was "shipyard work" and not ship crew's work. See Drake v. DuPont deNemours & Company, supra, 432 F.2d at 278; Johnson v. Oil Transport Company, 440 F.2d 109, 116 (5th Cir. 1971).

### THE NEGLIGENCE CLAIM

As an alternative theory, the plaintiff contends that under general maritime law, Trident was negligent in failing to provide him with a safe place to work. He claims that the defendants ordered him to remove certain portions of the muff coupling while he was in an awkward position. He further claims that the vessel was equipped with jacking equipment which could have been used to turn the shaft thus simplifying his task. Romero said that he and others made a request to use the jacking motor, but the request was refused. Weldon Cagle, a fellow Bethlehem crew member testified that he made a request to use the jacking equipment but the request was refused. This request was made to his foreman, a Bethlehem employee, and not to any crew member of the M/V ST. PATRICK. There was other evidence presented which showed that no permission from ship's personnel was required before the jacking equipment could be used.

The Court finds that it does have admiralty jurisdiction over this phase, because if there were any negligent acts and resulting injury, they occurred on navigable waters while the vessel was in Bethlehem's submersible drydock. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Watz v. Zapata Off-Shore Company, supra, 431 F.2d at 112–113.

The Court finds that the plaintiff injured his back while he was loosening the couplings from the shaft in the usual and customary manner, which often requires the use of a sledge hammer. This was an inherent risk that Romero encountered in carrying out the repair contract that Bethlehem had made with Trident.

Further, the Court finds that Bethlehem's personnel could have used the jacking equipment without the permission of the ship's crew. In fact, Cagle testified that he made a request to his Bethlehem foreman and not to the ship personnel. In addition, John Cionek, the plaintiff's foreman, testified that Romero never made such a request to him. Moreover, the ship's crew gave no orders respecting, nor did they participate in this phase of the shipyard's work. Considering all of the foregoing, plus the documentary evidence introduced at trial, the Court is convinced that no request was made to ship personnel to use the jacking equipment. In short, the Court finds that the plaintiff failed to sustain his burden of establishing any actionable negligence of the ship or its personnel.

## CONCLUSION

In conclusion, the plaintiff, Edward J. Romero, is not entitled to recover from Trident Maritime Agency, Ltd. on either the unseaworthiness or negligence theory. Thus, the Cross-Claim filed by Trident against Bethlehem is moot.

Judgment shall be entered in accordance with the findings made by the Court herein.