IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRUCE P. WILLIAMS | : | |
| | : | |
| Plaintiff, | : | C.A. No. K18C-05-039 JJC |
| | : | In and for Kent County |
| v. | : | |
| | : | |
| DANN MARINE TOWING, LC and | : | |
| M/V PALM COAST, LC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## OPINION

Submitted: May 22, 2020
Decided: August 6, 2020

Keith E. Donovan, Esquire, Morris James LLP, Dover, Delaware, & Lance A. Jackson, Montagna, Klein & Camden, LLP, Norfolk, VA, *Attorneys for Plaintiff*.

Michael B. McCauley, Esquire, Palmer, Biezup & Henderson LLP, & Jules V. Massee, Esquire, Hamilton, Miller & Birthisel, LLP, Tampa, Florida, Wilmington, Delaware, *Attorneys for Defendants*.

**Clark, J.**

Plaintiff Bruce P. Williams sues Defendants Dann Marine Towing, LC and M/V Palm Coast, LC (collectively "Dann Marine") for injuries he suffered while helping to dock a jet fuel barge at Port Mahon, Delaware. Mr. Williams worked as an engineer on the tugboat M/V Palm Coast that towed the barge. He suffered a back injury as he threw mooring lines from the barge to a mooring structure next to the dock.

Dann Marine owned the tug but did not own the barge that it towed from Baltimore, Maryland to Port Mahon, Delaware. General maritime law controls the principal substantive issues raised in this motion. That law creates an implied warranty to provide seamen with a seaworthy vessel. This warranty of seaworthiness permits a claim for its breach against either (1) the vessel's owner or (2) an entity that exhibits control over the vessel to a sufficient degree that a court should treat it as the vessel's situational owner.

Here, Dann Marine moves for partial summary judgment regarding Mr. Williams's claims that both the tug and the barge were unseaworthy. On this record, there are genuine issues of material fact that preclude summary judgment as to both vessels. Furthermore, whether the alleged breaches caused Mr. Williams's injury will also be an issue of fact. Accordingly, the Court must deny Dann Marine's motion for partial summary judgment.

## I.    FACTS OF RECORD AND BACKGROUND

The recited facts of record are those viewed in the light most favorable to Mr. Williams, as the non-movant. They also reflect all reasonable inferences drawn in his favor.

In 2007, Dann Marine contracted with Vane Brothers by charter agreement to tow Vane Brothers' barges. The charter agreement, applicable during this 2015

incident, sets forth the parties' responsibilities and expectations. Namely, it provides:

> [Dann Marine] shall at all times maintain each [tug] in a seaworthy condition, in a good state of repair, in efficient operating condition, and in compliance with all applicable laws and regulations. [Dann Marine] shall maintain adequate ship's spares aboard. [Vane Brothers] shall be responsible for maintaining all barges to be towed pursuant to this charter in a seaworthy condition.[1]

It also provides:

> [Dann Marine] shall man the [tugs] and provide and pay for all [tug] provisions, wages, medical expenses, and all transportation expenses of all crewmembers, and the insurance for the [tugs] . . . [Vane Brothers] shall be responsible for maintaining and crewing its own barges and equipment. [Vane Brother]'s employees and crew shall not be deemed to be employees or crew of [Dann Marine]. [Dann Marine]'s employees and crew shall not be deemed to be employees or crew of [Vane Brothers].[2]

For approximately nine years, Mr. Williams served as an engineer and crew member on Dann Marine's tugboat, the M/V Palm Coast. As the tug's engineer, Mr. Williams maintained its propulsion unit and helped dock the tug and any barge that it towed.

Its crew included Captain Potter, a mate, an engineer, and a deckhand. Dann Marine also employed Gerald Furlough as a second captain—a relief captain—for the tug. Together, the two captains mastered the boat for the four years preceding Mr. Williams's injury.[3] The two captains took separate shifts, with Captain Potter's rotations lasting about twice as long as Relief Captain Furlough's.[4] As a result,

---

[1] Def. Ex. D, at 2 ¶ 4.
[2] *Id.* at ¶ 5(a).
[3] Pl. Supplemental Letter in Opp. to. Summ. Judg., Ex. 1 Pl. Aff., at ¶ 4.
[4] *Id.* ¶ 5.

Captain Potter captained the tug approximately two-thirds of the time, while Relief Captain Furlough captained it one-third of the time.[5]

During the four years that the two captains alternated time, the tug regularly called at Port Mahon in Delaware.[6] It docked there from one to two times a month, to two to three times a week at others.[7] No Vane Brothers personnel ever manned the barge during transit or docking, however. Rather, during all such periods, the M/V Palm Coast's crew performed all needed functions on the barge. This practice directly contradicted the provision in the charter agreement that required Vann Brothers to crew its barges during times of operation.

On these trips, the M/V Palm Coast frequently towed Vane Brothers' barges from Baltimore to Port Mahon. On the day of the incident, it towed and then docked Vane Brothers' DS-204 barge. When doing so, it followed one of two routine docking procedures that varied based upon who captained the tug.[8]

The docking procedures at Port Mahon required taking mooring lines from the starboard side of the barge and placing two double lines around a dolphin, or fixed mooring structure, that was near the dock.[9] Once the crew placed the two lines around the dolphin, the captain pivoted the tug and barge around the dolphin in order to moor the barge to the fuel dock.[10] At that point, the tug's crew would secure the barge next to the dock.[11]

The docking procedure differed, however, based upon who captained the tug.[12] When Captain Potter docked the barge, he positioned the starboard side of the

---

[5] *Id.*
[6] *Id.* ¶ 6.
[7] *Id.*
[8] *Id.*
[9] *Id.* ¶ 9.
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 6.

4

barge immediately alongside the first dolphin.[13]  In contrast, Relief Captain Furlough regularly positioned the starboard side of the barge several feet from the first dolphin.[14]  In addition, Relief Captain Furlough routinely asked a single crew member to prepare the lines but did not do so until after the forward portion of the barge had passed the dolphin.[15]  After placing the barge in position, he expected that single crew member to then throw the lines.  Mr. Williams's expert opines that these practices deviated from industry standard.

Because of how far Relief Captain Furlough typically positioned the barge from the dolphin, Mr. Williams needed to throw the lines a farther distance.[16]  Fuel barges, such as DS-204, had tanks that made it impossible for Mr. Williams to stand on the edge of the barge's deck.  Rather, he had to climb on top of the fuel tank (the dome) and stand a few feet from the barge's edge when throwing the mooring lines.[17]  Given these circumstances, Relief Captain Furlough's docking practices forced Mr. Williams to throw the lines significantly farther than when Captain Potter docked the barge. In other words, Relief Captain Furlough's docking practice increased the throwing distance greater than necessary because he placed the barge too far from the first dolphin.[18]

On May 20, 2015, Mr. Williams seriously injured his back while throwing mooring lines during one of these dockings.  On that day, Relief Captain Furlough positioned the barge's starboard side approximately ten feet from the dolphin where the barge was to be moored.  Mr. Williams then boarded the barge and stood on its dome in order to throw the lines. As was Relief Captain Furlough's practice, he

---

[13] Pl. Resp. to Summ. Judg., Ex. 1 ¶ 11.
[14] Pl. Supplemental Letter in Opp. to. Summ. Judg., Ex. 1 Pl. Aff., at ¶ 9.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

instructed Mr. Williams to throw the lines onto the dolphin by himself. In addition, one of the two lines on the barge was extremely heavy and stiff because it had sat in the salt and sun. Mr. Williams's expert opines that the state of the line constituted a defective condition. Given the unreasonably heavy line and the unnecessary distance from the barge's dome to the dolphin, Mr. Williams suffered injury when throwing the heavy line such a long distance by himself.

In this suit, Mr. Williams raises three causes of action: (1) negligence under the Jones Act, (2) a claim for maintenance and cure, and (3) a claim that the tug and the barge breached the warranty of seaworthiness. Under the Jones Act, a seaman may sue in negligence for injuries suffered during the course of his employment.[19] Furthermore, a seaman possesses a right to maintenance and cure (medical and financial compensation) following an injury or illness during his employment.[20] Those causes of action are not at issue. On summary judgment, Dann Marine challenges only the third cause of action: the one based upon the warranty of seaworthiness.

---

[19] 46 U.S.C. § 30104; *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995). The Jones Act provides a cause of action in negligence for all seamen injured during the course of employment. Congress enacted the Jones Act to remove the bar on negligence invoked by the Supreme Court in *The Osceola*, 189 U.S. 158 (1903). The additional cause of action provided by the Jones Act permits seamen three available legal protections, more than that of other maritime workers, in recognition of their "exposure to the perils of the sea.'" *Chandris*, 515 U.S. at 354 (citing G. Gilmore & C. Black, Law of Admiralty § 6–21, 328–29 (2d ed. 1975); Robertson, A New Approach to Determining Seaman Status, 64 Texas L. Rev. 79 (1985)).

[20] *See* 2 The Law of Seamen § 26:1 (5th ed.) (explaining that "[m]aintenance and cure is to the seaman almost what workmen's compensation is to the landworker. Unless his illness or injury has been brought about by his act of willful misconduct, he is certain of receiving compensation intended to be sufficient to pay for his care with his employer assuming the responsibility of his medical expenses . . . [Maintenance and cure is] a remedy as to which the rules of fault, contributory negligence, assumption of risk, the fellow-servant rule of the common law, etc., are not applicable . . . [and is] a right given by the general maritime law in consequence of the seaman's status resulting from any shipping contract between the seaman and the master or the vessel [that] gives to the seaman, ill or injured in the service of the ship without willful misbehavior on his part, wages to the end of the voyage and subsistence, lodging, and medical care to the point where the maximum cure attainable has been reached.")

Under general maritime law, the warranty of seaworthiness implies a separate and independent duty requiring an owner or operator to maintain a seaworthy vessel.[21] Mr. Williams's unseaworthiness claim alleges, in part, the following:

> [a]t all times relevant herein, the defendant Dann Marine . . .as the owner or owner *pro hac vice* of the tug PALM COAST and as the owner *pro hac vice* of the barge, and/or the defendant MN Palm Coast, LC, as the owner of the tug PALM COAST, had a duty to provide the plaintiff with a seaworthy vessel that was reasonably fit for the purpose for which it was to be used. . . . Notwithstanding the foregoing duty, the defendant Dann Marine . . . breached its duty to provide the plaintiff with a seaworthy vessel, in that the vessel, and/or its appliances, and/or its crew, were dangerous and unseaworthy . . ..[22]

Dann Marine seeks partial summary judgment regarding Mr. Williams's warranty of seaworthiness claims.

## II.    ARGUMENTS OF THE PARTIES

Dann Marine seeks partial summary judgment concerning Mr. Williams's unseaworthiness claims that involve two vessels—the tug and the barge. Namely, it alleges on summary judgment that under maritime law it did not warrant the seaworthiness of the barge. It separately alleges that the facts of record do not generate an issue of fact regarding a breach of the warranty as to the tug. Finally, it independently argues that the facts of record do not create an issue of fact regarding legal cause.

First, specific to the barge, Dann Marine argues that its charter agreement with Vane Brothers assigns all liability for unseaworthiness of the barge to Vane Brothers, its owner. It further argues that the facts of record could not support a reasonable jury's finding that it operated the barge, because it cannot be considered

---

[21] *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960).
[22] Pl. Compl. ¶¶ 37–38.

the owner *pro hac vice* of the barge. Namely, it argues that the circumstances do not support a finding that it controlled the barge to the extent that it should be liable for keeping it seaworthy at the time of the incident.

Second, with regard to the tug's seaworthiness, Dan Marine argues that Mr. Williams's claim rests on a single negligent act. All agree that a single instance of negligence cannot alone support a claim for breach of the warranty. Dann Marine correctly emphasizes that an unseaworthiness claim based on operation of a vessel does not lie absent "a congeries of [negligent] acts."[23] It argues that the evidence does not support such a finding.

Third, it argues that the facts do not support leaving the issue of legal cause to the finder of fact. This argument relates to both vessels. Namely, it argues that Mr. Williams's unsafe actions constituted supervening negligence that broke the causal chain. In essence it argues what is akin to either a contributory negligence defense or the last clear chance doctrine. Given this, it argues that Mr. Williams's own negligence was the sole substantial factor in causing his injury as a matter of law.[24]

With regard to the barge, Mr. Williams counters that Dann Marine controlled the barge at the time of the accident. This alone, he argues, creates a genuine issue of material fact regarding whether Dann Marine can bear potential liability for the unsafely heavy mooring line that made it unseaworthy. Furthermore, he cites federal

---

[23] *See Vaughan v. Alliance Offshore*, 2019 WL 1778694, at *6 (E.D. La. Apr. 23, 2019) (citations omitted).

[24] Maritime law provides the substantive law for this case. Its standard for causation in unseaworthiness claims is likened to proximate cause, and approximates the substantial factor principles of causation in tort law. *See Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985) (explaining that "[t]he standard in an unseaworthiness claim is '*proximate cause* in the traditional sense.' . . . the district court instructed the jury without objection by either side, proximate cause means that (1) the unseaworthiness played a *substantial part* in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.") (emphasis added) (citing *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir. 1983) and *Alverez v. J. Ray McDermott & Co., Inc.*, 674 F.2d 1037, 1042–43 (5th Cir. 1982)).

8

case law that recognizes that the owner of a tugboat that moves and controls an unpowered barge may be liable for its unseaworthiness. Finally, he disagrees with Dann Marine's argument that a contract between the tugboat's owner and the barge's owner can limit Dann Marine's liability to a non-party to the contract. In this regard, he argues that the implied warranty of seaworthiness is non-delegable.

With regard to the tugboat's seaworthiness, Mr. Williams argues that the evidence of record supports an inference of more than one negligent act. Namely, he cites evidence of record regarding Relief Captain Furlough's repeated practice of docking the barge unsafely at Port Mahon. This repeated negligent practice, he argues, create a factual issue regarding operational unseaworthiness.

Finally, with regard to legal cause, he emphasizes the factual nature of any such inquiry. He emphasizes that, in warranty of seaworthiness claims, the general rule is that summary judgment regarding legal cause is inappropriate. In this case, he argues that the facts of record justify following the general rule.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and if the movant is entitled to judgment as a matter of law.[25] Furthermore, partial summary judgment is available pursuant to Superior Court Civil Rule 56 and may dispose of individual claims.[26] In deciding such a motion, the Court must view the evidence in the light most favorable to the non-moving party.[27] The burden of proof is initially on the moving party.[28] However, if the movant meets his or her initial burden regarding an issue, then the burden shifts to the non-moving party to

---

[25] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[26] Super. Ct. Civ. R. 56(a)–(b) (providing that either the claimant or defending party may move for summary judgment as to all or any part thereof the case's claims).
[27] *Brozaka v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[28] Super. Ct. Civ. R. 56(e); *Moore*, 405 A.2d at 680 (Del. 1979).

demonstrate the existence of material issues of fact regarding that issue.[29] The non-movant's evidence of material facts in dispute must be sufficient to withstand a motion for judgment as a matter of law and sufficient to support the verdict of a reasonable jury.[30]

## IV.   DISCUSSION

Count II of Mr. Williams's complaint alleges that Dann Marine breached the warranty of seaworthiness as to (1) the barge, which it did not own, and (2) the tugboat, which it did.  To decide its motion for partial summary judgment, the Court must examine the facts of record that bear on each vessel.

As to the barge, the Court must examine two principal issues.  First, whether there is a genuine issue of material fact regarding the barge's seaworthiness.  If there is such a factual issue, then the Court must turn to whether Dann Marine could be liable for the barge's unseaworthiness.

As to the tugboat, there is no dispute that Dann Marine owned and controlled the tug.  The warranty clearly applies.  Here, the Court must determine whether the record generates an issue of fact regarding whether the relief captain's docking procedures made the tug unseaworthy in operation.  If it did, there is a genuine issue of material fact as to a breach of the warranty.

As a final matter, Dann Marine argues that Mr. Williams's alleged negligence was the sole legal cause of his injuries.  To decide that, the Court must examine maritime law's causation standard for seaworthiness claims in light of the facts of record.

---

[29] *Moore*, 405 A.2d at 681 (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).
[30] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).

## A.     The Warranty of Seaworthiness

The parties stipulate that general maritime law provides the relevant substantive law.[31]   It provides for an implied warranty of seaworthiness.   That warranty makes ship owners strictly liable for injuries to seamen caused by their vessels' unseaworthiness.[32]

This warranty includes an implied promise that the vessel be reasonably fit for its intended use.[33]  It applies to both the vessel's equipment and its crew.[34]  As to the former, it applies to all things about a ship, including, but not limited to decks, machinery, gear, and the tools furnished on the ship.[35]  As to the later, the warranty includes an implied promise of competent operation of a vessel, including adequate training and skill of crew.[36]  An unsafe manner of work by a captain or crew may render a vessel unseaworthy.[37]

General maritime law also specifically defines the legal cause standard for these claims.   The standard, while not identical to the substantial factor causation standard applicable to tort claims in many jurisdictions, is nevertheless similar.[38]  Namely, a plaintiff must demonstrate that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury

---

[31] Pl. Compl. ¶ 1; Def. Ans. ¶ 1.

[32] 70 Am. Jur. 2d Shipping § 344.

[33] *Id.* at § 183.

[34] *Id.*

[35] *Id.* at § 344.

[36] *Id.* at § 183.

[37] *Rogers v. Eagle Offshore Drilling Services, Inc.*, 764 F.2d 300, 303 (5th Cir. 1985) (citations omitted).

[38] *See* Restatement (Second) of Torts § 431 (1965) (providing that "[t]he actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm").

was either a direct result or a reasonably probable consequence of the unseaworthiness."[39]

## B.  There are genuine issues of material fact regarding the seaworthiness of the barge.

Because the tug towed an unpowered barge, Mr. Williams's *operational* unseaworthiness claim applies to the vessel doing the operating—the tug.  That is discussed below.  Here, the only unseaworthiness claim relevant to the barge relates to the unreasonably heavy mooring line.  The line belonged to the barge.  Unseaworthiness may arise out of a defective condition on a vessel.[40]  Namely, a seamen "sustaining injuries by reason of the unseaworthiness of a ship *or her tackle* may recover compensatory damages . . . from the owner."[41]

As a threshold matter, the record contains facts and an expert opinion that, when considered in the light most favorable to Mr. Williams, create a factual issue regarding the barge's seaworthiness.  In addition to Mr. Williams's deposition testimony and affidavits, his expert witness, Captain Joseph Ahlstrom, opines that the barge's heavy and stiff lines caused his injury.  Namely, he proffers that "[t]he root cause of [the] accident is clearly the heavy and stiff mooring line."[42]  A genuine issue of material fact therefore exists as to the seaworthiness of the barge based upon a physical defect in its tackle.

The more difficult question is whether the warranty extends from Dann Marine to Mr. Williams for this alleged unseaworthiness.  The parties provide two distinct lines of federal case law that provide opposite results.

---

[39] *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992).
[40] *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971) (citing the defective physical condition of the vessel itself in *Mitchell*, 362 U.S. at 549–50 and the defective gear upon a vessel in *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944)).
[41] *Daniels v. Florida Power & Light Co.*, 317 F.2d 41, 43 (5th Cir. 1963).
[42] Pl. Resp. in Opp. to Summ. Judg., Ex. 2, at 6.

Mr. Williams references two federal circuit court of appeals cases, *Eskine v. United Barge Co.*[43] and *Griffith v. Wheeling-Pittsburgh Steel Corp.*[44]  Both recognize that a tugboat's owner that has complete operational control over a barge may be liable for the barge's unseaworthiness.  Both involve circumstances similar to the case at hand.  They recognize an issue of fact regarding whether the tugboat's owner became the owner *pro hac vice* of the barge for the purpose of the warranty.

In contrast, Dann Marine cites a number of federal district court cases that examine the same relationship and draw the opposite conclusion.  Namely, those trial court decisions held, as a matter of law, that a tug does not have a sufficient degree of control over a barge to justify applying the warranty to the tug's owner.

The Court's analysis begins with the recognition by the United States Supreme Court that the duty of seaworthiness is "an absolute and nondelegable one which the owner of a vessel owes to the members of the crew who man her."[45]  Dann Marine did not own the barge.  Nevertheless, in addition to applying to the owner, the warranty of seaworthiness applies to the *operator* of a vessel.[46]  Namely, "[t]he idea of seaworthiness and the doctrine of implied warranty of seaworthiness arises out of the vessel, and the critical consideration in applying the doctrine is that the person sought to be held legally liable must be in the relationship of an owner or operator of a vessel."[47]  This reasoning stems from "the usual relationship for

---

[43] 484 F.2d 1194, 1196 (5th Cir. 1973).

[44] 610 F.2d 116 (3d Cir. 1979), *vacated sub nom. Am. Commercial Lines, Inc. v. Griffith*, 451 U.S. 9655 (1981).

[45] *United N.Y. & N.J. Sandy Hook Pilots Ass'n. v. Halecki*, 358 U.S. 613, 616 (1959).

[46] *Yoash v. McLean Contracting Co., Inc.*, 907 F.2d 1481, 1487 (4th Cir. 1990), *rev'd on other grounds*, 498 U.S. 1117 (1991); *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 181 (5th Cir. 1981) (stating that "[t]o be held liable for breach of the duty, the defendant 'must be in the relationship of an owner or operator of a vessel'").

[47] *Daniels v. Florida Power & Light Co.*, 317 F.2d 41, 43 (5th Cir. 1963).

recovery [, which] has been referred to as three-cornered: master, i.e., owner *or* operator, vessel and shipworker."[48]

In *Eskine*, the United States Court of Appeals for the Fifth Circuit addressed a seaworthiness claim arising after a tug's crewmember fell through an open hatch of a barge towed by a tug.[49] In that case, trial evidence did not identify the owner of the barge. Regardless of who owned the barge, the tug owner did not.[50] At trial, the district court permitted the jury to consider whether the tow controlled the barge sufficiently to be considered its owner *pro hac vice*. The jury then found a sufficient degree of control by the tug owner to imply that it warranted the barge's seaworthiness. It also found that the tug owner breached the warranty. Thereafter, the defendant filed post-trial motions seeking to overturn the verdict.[51]

On appeal, the Fifth Circuit affirmed. It relied upon facts that demonstrated the tug company's exclusive control of the barge at the time of the incident.[52] Given that evidence, it upheld the finding that the tug owner was the owner *pro hac vice* of the barge.[53] As a result, the tug owner warranted the barge's seaworthiness at the time of the injury.[54] When so holding, the court addressed the following facts of record relevant to control:

> [t]he barge was moved to the loading dock by [the] tug and tied to the dock by [the tug owner's] employees. It was in the exclusive control of [the tug owner] while being loaded. When loaded, it would have been moved from the dock by [the tug owner]. The relationship was, or was analogous to, that existing under a bareboat charter. . . . *Although the voyage of the barge on which [the plaintiff] was injured was short in both time and space, there was a movement on navigable waters to the*

---

[48] *Id.* (emphasis added).
[49] 484 F.2d at 1195.
[50] *Id.*
[51] *Id.* at 1196.
[52] *Id.*
[53] *Id.*
[54] *Id.*

14

*dock, a loading at the dock and an intended movement from the dock with [the tug owner] having, at all times, **the complete and exclusive control** of the barge.* This being so, [it] was the owner *pro hac vice* of the barge and as such liable for damages for injuries resulting from unseaworthiness.[55]

Here, Dann Marine had the same level of control over DS-204 as the defendant did in *Eskine*. In fact, it held that degree of control for longer. If accepted by the jury, the facts support a finding that the unmanned barge was under the tug's complete control from Baltimore to Port Mahon. By affidavit, Mr. Williams attests to the level of control Dann Marine had over Vane Brothers' vessels. Namely, he recites that "[n]o one except the crew of the tug . . . came aboard the barge or the tug, from the time the tug and barge departed the dock from which the barge took on fuel, until after the tug and barge completed docking at Port Mahon."[56] As a crewmember of the tug, he also recites that both "the tug and barge were in possession of, under the control of, and were navigated by, the crew of the tug M/V Palm Coast [and that the tug] did not share or give up control or turn navigation of the tug and barge over to anyone else."[57] Finally, given the time of departure from Baltimore and arrival at Port Mahon, record evidence supports an inference that this period of control lasted approximately 15 hours.[58]

In its written submissions, Dann Marine placed significant reliance on its charter agreement with Vane Brothers. That agreement defines the contractual relationship between the two.[59] It also demonstrates the parties' intent that Dann

---

[55] *Id.* (emphasis added).
[56] Pl. Resp. to Summ. Judg., Ex. 1 ¶ 8.
[57] *Id.*
[58] Pl. Resp., Ex. 1 ¶ 15 (providing that the tow and barge left Baltimore at 8:30 p.m. on May 19, 2015); Pl. Resp., Ex. 2 at 5 (summarizing that the accident occurred during docking at 11:15 a.m. on May 20, 2015).
[59] Def. Ex. D.

Marine not be responsible for the seaworthiness of the barge.[60] While it allocates liability between the two parties, the allocation is not dispositive regarding a third-party's seaworthiness claim. The circumstances surrounding actual operations are likewise relevant to what will be an issue of fact. As is well-recognized, "[t]he warranty of seaworthiness imposes a nondelegable duty on a vessel owner or operator to insure that the vessel is fit for voyage."[61] The charter agreement may constitute admissible evidence at trial regarding the degree of control asserted by Dann Marine over the barge. In contrast, there are significant facts of record supporting Dann Marine's complete and actual control over the barge at the time of the incident.

Dann Marine initially argued that only the owner of a vessel could be liable for its unseaworthiness. After oral argument, it revised its argument and recognized that the warranty may flow from those who do not own the vessel—namely, also to the owner *pro hac vice* of the vessel. In support of its argument that it did not qualify as the owner *pro hac vice* of the barge, it cites the United States Supreme Court decision in *Chandris, Inc. v. Latsis*.[62] It also relies heavily upon four United States district court decisions: *Walters v. Dann Marine Towing, LC*;[63] *Roulston v. Yazoo River Towing, Inc.*;[64] *Coakley v. Sea River Maritime, Inc.*;[65] and, *Farnsworth v. Basin Marine, Inc.*[66]

At the outset, Dann Marine incorrectly relies upon the Supreme Court's analysis in the *Chandris* decision. It argues that *Chandris* provides that one can only raise a warranty of seaworthiness claim if he or she is a crewmember on the vessel

---

[60] *Id.*

[61] *Yoash*, 907 F.2d at 1487.

[62] 515 U.S. 347 (1995).

[63] 2013 WL 1562459 (D. Md. Apr. 10, 2013).

[64] 418 F. Supp. 2d 851 (S.D. Miss. 2006).

[65] 319 F. Supp. 2d 712, 713 (E.D. La. 2004).

[66] 1998 WL 259972, at *1 (E.D. La. May 20, 1998).

where he or she suffered injury. To the contrary, the Supreme Court's *Chandris* decision focused solely on a Jones Act claim. Namely, it turned on whether the claimant qualified as a "seaman" as that term is found in the Jones Act.[67] Because the Supreme Court did not examine seaworthiness claims, the decision provides no bridge of reasoning to justify extrapolating (1) the statutory definition of an aggrieved person under the Jones Act to (2) a claimant who seeks damages for a breach of the warranty of seaworthiness. The former involves the definition of an aggrieved person for purposes of a federal statutory claim. The latter arises under general maritime law.

Moreover, the *Chandris* decision examined an injury to a longshoreman and focused on whether that dockworker qualified as a seaman under the Jones Act.[68] The Court held that he did not. When so holding, the Court recognized that the Jones Act provides compensation for sea-based maritime employees and is tort based.[69] The competing statutory scheme for a longshoreman (who is a land-based maritime employee) is the Longshoreman and Harbor Workers' Compensation Act.[70] In Mr. Williams's case, the distinction between sea and land based maritime employees is immaterial.

Likewise, the Court finds unpersuasive the reasoning in the four district court cases that Dann Marine cites. Though the facts in those cases are similar to the case at hand, the Court declines to follow them for the following reasons.

Most directly, three of the four decisions come from federal district courts within the Fifth Circuit.[71] None of the three acknowledge the mandatory authority

---

[67] *Chandris*, 515 U.S. at 371–72.
[68] *Id.* at 354–72.
[69] *Id.* at 358–61.
[70] 33 U.S.C.A. § 903; *Chandris*, 515 U.S. at 355.
[71] *Roulston*, 418 F. Supp. 2d at 851; *Coakley*, 319 F. Supp. 2d at 712; and *Farnsworth*, 1998 WL 259972, at *1.

in their Circuit—*Eskine*.  Rather, the three rely upon another Fifth Circuit decision, *Smith v. Harbor Towing & Fleeting*.[72]  Analogously to *Chandris*, that decision simply addresses who qualifies as a seamen under the Jones Act.[73]  It does not address the warranty of seaworthiness.  Furthermore, in the *Smith* decision, the Fifth Circuit also distinguished entirely different classes of plaintiffs—land versus sea-based maritime employees.[74]

Because these district court decisions neither address mandatory authority in their jurisdiction nor provide adequate support for applying a statutory definition outside of that statute, they are not persuasive.  None of the three account for *Eskine*'s holding—one that recognizes that a tug that has complete operational control over a barge at the time of an injury may be the owner *pro hac vice* of the barge for purposes of a seaworthiness claim.[75]  Whether referred to as an operator or owner *pro hac vice*, the analysis is the same.[76]  The focus is on whether there was a sufficient degree of control over the barge.  As in other contexts, control is generally an issue for the trier of fact.[77]

---

[72] 910 F.2d 312 (5th Cir. 1990).

[73] *Id.* at 313–15.

[74] *Id.*

[75] 484 F.2d at 1196.

[76] The Court recognizes as a general rule that the warranty flows from the owner of the vessel. Case law discusses exceptions to that, including bareboat charters, demise charters, and owners *pro hac vice*.  On balance, the case law provides that an owner *or operator* of a vessel be charged with this implied warranty.  *Yoash*, 97 F.2d at 1487 (citing *Mahnich*, 321 U.S. at 99; *Baker*, 656 F.2d at 181 (citing *Daniels*, 317 F.2d at 43).  In this regard, one maintaining sufficient control over a vessel at the time of an injury is the vessel's owner *pro hac vice* for seaworthiness purposes. *Eskine*, 484 F.2d at 1196 (citing *Reed v. S. S. Yaka*, 373 U.S. 410, 412–13 (1963)).

[77] *See Fisher v. Townsends, Inc.*, 695 A.2d 53, 59 (Del. 1997) (explaining, in the agency context, that control is a factor to be considered almost universally by the trier of fact on a case by case basis).  *See also* Restatement (Second) of Agency § 220 (1958) (explaining that the extent of control is a matter of fact to be considered in determining whether one acting for another is a servant or independent contractor). *See e.g. Koutoufaris v. Dick*, 604 A.2d 390, 402 (Del. 1992) (stating that "[o]rdinarily, disputed questions of control between distinct entities are best reserved for jury determination").

The other district court decision that Dann Marine cites is the United States District Court of Maryland's decision in *Walters v. Dann Marine Towing, L.C.* It addresses facts similar to the case at hand, but likewise conflates Jones Act claims with seaworthiness claims by similarly relying on the *Chandris* decision.[78] When doing so, the decision applies too strict of a definition of "constructive ownership."[79] Namely, it does not recognize that the benchmark for assessing constructive ownership is operation, which turns on control. Moreover, it fails to recognize that such an inquiry should nearly always be factual in nature.

On balance, the federal district court cases that Dann Marine cites must also be considered in light of the United States Court of Appeals for the Third Circuit's decision in *Griffith v. Wheeling-Pittsburgh Steel Corp.*[80] There, the Third Circuit similarly addressed the relationship between a tug and a barge. When doing so, it cited the *Eskine* decision's reasoning approvingly. Namely, in an appeal of a factual finding that a tug owner was the owner *pro hac vice* of a barge, the Third Circuit held:

> when [a ship] chooses to take exclusive possession and control of a barge in navigation, even for a limited time and in a limited space, it should, as we have held, be obliged to discharge the responsibilities of an owner. Another experienced admiralty court agrees.[81]

The Court finds the reasoning in the two federal circuit court of appeals decisions to be the most persuasive.

In summary, the record evidence presents a question of fact concerning Dann Marine's possession and control of the barge at the time of Mr. Williams's injury. Viewing the facts in the light most favorable to Mr. Williams, a reasonable jury

---

[78] 2013 WL 1562459, at *2–3.
[79] *Id.*
[80] 610 F.2d 116 (3d Cir. 1979), *vacated sub nom. Am. Commercial Lines, Inc. v. Griffith*, 451 U.S. 9655 (1981).
[81] *Id.* at 128 (citing *Eskine*, 484 F.2d at 1194).

19

could find that Dann Marine's towing, guiding, and docking the unmanned, unpowered barge constituted exclusive control over the barge. Accordingly, given a factual issue regarding an allegedly defective mooring line, there are questions of fact as to (1) whether the warranty attached to the barge for Mr. Williams's benefit, and if it did, (2) whether Dann Marine breached it.

**C.     There are genuine issues of material fact regarding the seaworthiness of the tug.**

Apart from the barge, the parties dispute whether there is a genuine issue of fact regarding the tug's seaworthiness. Here, Mr. Williams occupied the barge at the time of his injury. At the outset, a crew member need not be physically situated aboard a vessel for its seaworthiness warranty to apply.[82] Instead, for example, he or she may recover under the warranty for suffering injuries while in the surrounding water or while working on an accompanying barge.[83]

With regard to this issue, Dann Marine's principal argument is that Mr. Williams focuses on a single allegedly negligent act—docking the barge at the time of the injury. It is correct that an isolated negligent act of a captain or crew does not make a vessel unseaworthy.[84] Furthermore, Dann Marine correctly recognizes that warranty of seaworthiness claims are not negligence based. As the United States Supreme Court has recognized, there is a "complete divorcement of unseaworthiness

---

[82] *See e.g. Eddy v. Mon River Towing, Inc.*, 2004 WL 2984355 (W.D. Pa. June 7, 2004) (denying summary judgment where an employee's injury occurred on the accompanying barge rather than the harboring vessel).

[83] *See Neely v. Club Med Management Servs.*, 63 F.3d 166 (3d Cir. 1995) (applying the unseaworthiness warranty where a diver suffered an injury once off the vessel and in the water); *Ainsworth*, 2013 WL 6044376, at *3–5 (applying the warranty where the plaintiff fell off of a barge due to the actions of the tow).

[84] *Vaughan*, 2019 WL 1778694, at *6 (quoting *Daughdrill v. Ocean Drilling & Expl. Co.*, 709 F. Supp. 710, 712 (E.D. La. 1989) (citing *Robinson v. Showa Kaiun K.K.*, 451 F. 2d 688, 690 (5th Cir. 1971))).

20

liability from concepts of negligence."[85]  Nevertheless, there is one context where negligence is relevant.  Namely, *a pattern* of negligent acts can amount to unseaworthiness in operation.  To be so, there must be a "'pervasive' operational negligence consisting of 'a congeries of acts . . .'"[86]  This is best termed operational unseaworthiness.  Circumstances falling within this category include an unsafe method of work when performing a vessel's services.[87]

Mr. Williams claims that the docking measures Relief Captain Furlough took on the day of his accident were not proper or safe.  He alleges that (1) Relief Captain Furlough's method of work when docking the barge was unsafe; (2) the relief captain assigned too few men the task of throwing double mooring lines onto the first dolphin; and (3) he incompetently docked the barge at Port Mahon."[88]  Mr. Williams's expert, Captain Ahlstrom, supports these claims.[89]  In his report and affidavit, Captain Ahlstrom proffers that Mr. Williams's injury occurred due to the unsafe conditions and practices taken on the day in question.[90]  He also explains that

---

[85] *Usner*, 400 U.S. at 499.

[86] *Id.*

[87] *Rogers*, 764 F.2d at 303.

[88] Pl. Supplemental Letter in Opp. to Summ. Judg. at 1.

[89] Pl. Resp. to Summ. Judg., Ex. 2.

[90] *Id.* at 6–7 (explaining that Mr. Williams' injury occurred because "1. There was no adequate 'Risk Assessment' for using an identified heavy and stiff mooring line. 2. Failure of Captain to conduct pre-mooring meeting with entire crew prior to mooring in compliance with the Dann Marine Tugboat Safety Management System on May 20, 2015. 3. Failure to provide adequate personnel or alternative methods to deploy this identified 'heavy and stiff' mooring line during berthing on May 20, 2015. 4. Failure to provide proper instructions to Engineer Bruce Williams prior to mooring the tugboat PALM COAST on May 20, 2015 at Port Mahon, Delaware. 5. Failure to place the Barge DS-204 alongside the place of mooring in order to safety execute the heaving of a mooring line as practiced in the industry and in consideration of the weight and flexibility of the mooring line. 6. Failure to comply with Dann Marine Tugboat Safety Management System, as described above.").

the mooring should have been conducted according to standard practices[91] and outlines other measures that the relief captain should have taken.[92]

Alone, on a single day, these allegedly negligent acts may not have created a factual issue regarding unseaworthiness. What creates an issue of fact in this case, however, is the evidence of record that Relief Captain Furlough used this improper procedure every time he docked the barge at Port Mahon.[93] The relief captain mastered the tug approximately one-third of the time. The M/V Palm Coast docked the barge at Port Mahon anywhere between one to two times a month, to as much as two or three times a week. It did so for years. Accordingly, facts of record support a reasonable inference that the relief captain's actions on the day of Mr. Williams's injury were not an isolated act. Instead, the finder of fact could reasonably conclude that Relief Captain Furlough's unsafe method of docking during the four years that he served aboard the tug constituted pervasive operational unseaworthiness. Mr. Williams's affidavits, his deposition testimony, and Captain Ahlstrom's expert opinion raise genuine issues of material fact as to whether the crew's methods were unseaworthy.

### D. There are genuine issues of material fact regarding whether Dann Marine caused harm to Mr. Williams.

Finally, Dann Marine seeks partial summary judgment because he claims Mr. Williams's own negligence bars his claim. Namely, Dann Marine argues that he

---

[91] *Id.* at 7 (stating that the mooring should have been done by "1. Placing the barge alongside the dolphin . . . 2. Provid[ing] enough personnel to safely perform this task. . . 3. Using a heaving line to the mooring area.").

[92] *Id.* (providing alternative reasonable options including "1. Use lighter and less stiff lines when mooring. 2. Ensure the tug or was alongside the dolphin or berth before putting lines out. 3. Use heaving line with personnel on dock or dolphin if possible. 4. Allot additional personnel. Use at least 2 crew members to throw mooring lines as was ultimately used on May 20, 2015 to get the line to the dolphin").

[93] Pl. Supplemental Letter in Opp. to Summ. Judg., Ex. 1 Pl. Aff., at ¶ 9.

does not sustain his burden on summary judgment because his actions constituted supervening negligence as a matter of law. Stated differently, it maintains that Mr. Williams's alleged contributory negligence in choosing to lift and throw the heavy line by himself requires partial summary judgment on the warranty claims. Unaddressed in the briefing and argument, however, is (1) how a warranty of seaworthiness claim intersects with a plaintiff's alleged negligence when determining legal cause, and (2) at what point under general maritime law, if any, does a plaintiff's allegedly negligent conduct rise to a supervening level.

Though a breach of the warranty of seaworthiness is not negligence based, general maritime law recognizes that comparative negligence concepts nevertheless apply in warranty of seaworthiness claims.[94] Dann Marine's argument regarding legal cause is in essence a contributory negligence or last clear chance defense. Neither are available under general maritime law. Rather, Schoenbaum's Admiralty & Maritime Law treatise recognizes that the comparative negligence of a plaintiff may reduce damages due the plaintiff.[95] However, only "if [a plaintiff's] injury results from the seaman's negligent use of an otherwise seaworthy vessel or his

---

[94] *See Chotin Transp., Inc. v. United States*, 819 F.2d 1342, 1354 (6th Cir. 1987) (citing *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09 (1953) (recognizing that "comparative fault is applicable . . . in actions for unseaworthiness under general maritime law."); *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431 (1939) (referencing the "established admiralty doctrine of comparative negligence"; and *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71, 74 (5th Cir.1980) (explaining that contributory negligence is not ordinarily a defense to a claim for unseaworthiness but rather speaks to the question of reduction of damages).

[95] 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 6:25 (6th ed. 2018) (citing *Villers Seafood Co., Inc. v. Vest*, 813 F.2d 339 (11th Cir. 1987); *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790 (9th Cir. 1986); *Matthews v. Ohio Barge Line, Inc.*, 742 F.2d 202 (5th Cir. 1984); *Fontenot v. Teledyne Movible Offshore, Inc.*, 714 F.2d 17 (5th Cir. 1983); *Snow v. Whitney Fidalgo Seafoods, Inc.*, 686 P.2d 1090 (Wash. Ct. App. 1984)). *See also Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 682 (10th Cir. 1981) (explaining that "[c]ontributory negligence is, however, a valid defense [to the doctrine of unseaworthiness] if it does not result in a complete bar of all claims, but rather in an allocation of fault on a comparative basis").

23

negligence is the sole cause of his injury, . . . will [he or she] be barred from recovery."[96]

Because Mr. Williams's unseaworthiness claims is warranty based, the inquiry is one of legal cause, as opposed to proximate cause. As such, a plaintiff must meet a specialized burden of proof on this issue at trial. Namely, a plaintiff must demonstrate that the vessel's unseaworthy condition "played a substantial part in bringing about or actually causing [the] injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[97] This standard is more demanding than the standard applicable in a simple negligence claim under the Jones Act.[98] Notwithstanding this higher ultimate burden, courts still find the issue to be generally one of fact. Courts have rarely found the issue of causation in seaworthiness claims to be a matter of law.[99]

Dann Marine cites three decisions that discuss situations when summary judgment (or judgment as a matter of law after trial) may be appropriate regarding who *caused* an injury.[100] Of the three decisions, it primarily discusses the decision in *Lyons v. Ohio River Sand and Gravel Co.*[101] There, the United States Court of Appeals for the Fourth Circuit affirmed a trial court's directed verdict for the

---

[96] Schoenbaum, Admiral & Maritime Law § 6.25 (citations omitted); 1 The Law of Maritime Personal Injuries § 8:12 (5th ed.) (stating "[c]ontributory negligence, therefore, may be considered only in mitigation of the damages to which the plaintiff would otherwise be entitled. Contributory negligence does not defeat the right of recovery unless that negligence is the sole cause of the injury.").

[97] *Ainsworth*, 2013 WL 604436, at *3 (quoting *Phillips*, 953 F.2d at 928).

[98] *Vaughan*, 2019 WL 1778694, at *6 (citing *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 380 (5th Cir. 2012) and Schoenbaum, Admiralty & Maritime Law § 6:25).

[99] *Jefferson v. Taiyo Katun, K.K.*, 310 F.2d 582, 583 (5th Cir. 1962) (citing Norris, Maritime Personal Injuries § 43); *Cook v. Am. S.S. Co.*, 53 F.3d 733, 742 (6th Cir. 1995) (citing *Roper v. United States*, 368 U.S. 20 (1961); *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538 (11th Cir. 1989); *Jordan v. United States Lines, Inc.*, 738 F.2d 48 (1st Cir. 1984); and *Joyce*, 651 F.2d at 681).

[100] Def. Supplemental Letter for Summ. Judg. at 4 (citing *Lyons v. Ohio River Sand and Gravel Co.*, 683 F.2d 99 (4th Cir. 1982); *Hughes v. Conticarriers and Terminals, Inc.*, 6 F.3d 1195 (7th Cir. 1993); *Keel v. Greenville Mid-Stream Serv., Inc.*, 321 F.2d 903 (5th Cir. 1963).

[101] 683 F.2d 99 (4th Cir. 1982).

defendant. The plaintiff in the *Lyons* case chose to lift, by himself, heavy plates on a ship and injured himself.[102] He could have requested aid from his fellow crew members but declined to do so.[103] In its decision, the Fourth Circuit explained that the "only substantial factor in the plaintiff's injury was his own unsafe approach."[104]

Rather than turning on whether a plaintiff's contributory negligence bars his or her claims, the *Lyons* decision turned on there being *no evidence that the defendant acted wrongfully*.[105] The plaintiff conceded in his trial testimony that (1) he was *not* ordered to lift the plates by himself, (2) he failed to seek assistance, and (3) his fellow crew members typically helped one another with such tasks.[106] Furthermore, the plaintiff produced no evidence that the defendant breached the warranty. If, as in the *Lyons* case, the record presents no evidence that a defendant breached the warranty of seaworthiness, summary judgment (or later judgment as a matter of law) would be appropriate. In such a case, however, the decision would turn on something completely independent of the plaintiff's contributory negligence.

In contrast, in this case, there is record evidence supporting a reasonable jury's finding that Dann Marine breached the warranty of seaworthiness and that the breaches caused harm to Mr. Williams. First, as discussed above, there is sufficient evidence of record—both fact and expert—to supports an inference that the tug's docking procedure made the tug unseaworthy. Second, there is sufficient evidence of record—both fact and expert—to support an inference that the unreasonably heavy mooring line made the barge unseaworthy. Third, Dann Marine does not contest that Mr. Williams suffered injury when throwing the overly heavy mooring line while docking the barge. Accordingly, there is a factual issue regarding the

---

[102] *Lyons*, 683 F.2d at 100.
[103] *Id.* at 100–01.
[104] *Id.*
[105] *Id.* at 101.
[106] *Id.* at 100–01.

necessary causal nexus between the alleged breaches and the alleged harm. Given this evidence of record and the fact that the issues of causation in seaworthiness claims are nearly always issues of fact, it will remain an issue of fact in this case.

Finally, the jury will need to consider Mr. Williams's comparative negligence, if any. If it finds him to be comparatively negligent, it will be properly instructed regarding the effect that must have on his damages. In that instance, given the doctrine of comparative negligence in general maritime law, the jury will need to assess comparatively, by relative percentage, the causes of Mr. Williams's injury. Under the facts of record, such a decision is not one properly made as a matter of law.

## V.    CONCLUSION

Genuine issues of material fact exist regarding the unseaworthiness of both the barge and the tug. In addition, whether the seaworthiness of either or both caused harm will also be an issue of fact at trial. As a result, Dann Marine's motion for partial summary judgment as to Count II will be **DENIED**.